T.C. Memo. 2008-217

UNITED STATES TAX COURT

YEAROUT MECHANICAL & ENGINEERING, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8130-01.            Filed September 24, 2008.

<u>Clinton W. Marrs</u> and <u>Pamela A. Rice</u>, for petitioner.

<u>Kelly M. Davidson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>: Respondent determined deficiencies in
petitioner's Federal income tax as follows:

| Taxable Year Ended | Deficiency |
| --- | --- |
| Aug. 31, 1996 | $42,836 |
| Aug. 31, 1997 | 129,727 |

By amendment to answer respondent asserted increased deficiencies of $115,940 for petitioner's taxable year ended (TYE) August 31, 1996, and $177,520 for petitioner's TYE August 31, 1997. The issue for decision is what portions of petitioner's claimed rental expenses, incurred by leasing construction equipment from its shareholders during the taxable years in issue, are deductible under section 162(a)(3).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, the supplemental stipulation of facts, and the accompanying exhibits.

Introduction

Petitioner is a mechanical contractor, incorporated in New Mexico in 1964, and licensed to construct, install, repair, and maintain plumbing and heating systems and their components. Petitioner's principal place of business at the time the petition was filed was in Albuquerque, New Mexico. Petitioner reports its income using the percentage completion method of accounting with a fiscal yearend (FYE) of August 31. During the taxable years in issue petitioner's shareholders and officers, as well as their ownership percentages, were as follows:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

| Shareholder | Office | 1996 Ownership | 1997 Ownership |
|---|---|---|---|
| Robert (Kim) Yearout[1] | CEO | 48% | 51% |
| Kevin Yearout | President | 24 | 25 |
| Bryan Yearout | Vice president, secretary, and treasurer | 12 | 13 |
| Other family members | | 16 | 11 |

[1]Kim Yearout is the father of Kevin and Bryan Yearout.

Petitioner's Business Expansion

For the first 25 years of its existence petitioner was a conventional mechanical contractor with annual gross revenues between $7 and $10 million in the late 1980s and early 1990s. In the late 1980s semiconductor manufacturers Intel Corp. (Intel), Motorola, Inc. (Motorola), Sumitomo Electric Industries, Ltd. (Sumitomo), and others began building computer chip manufacturing facilities in Albuquerque triggering an unprecedented construction boom in that area of New Mexico (Bernalillo County). Petitioner responded to these developments by attempting to transform its business to serve the needs of Albuquerque's new high-tech construction market.

Petitioner performed its first project at Intel in late 1992 and successfully completed several other, larger projects for Intel in 1993 and 1994. By working on these early projects

petitioner began acquiring expertise in "process piping"[2] systems in "clean room"[3] environments. In 1995 petitioner successfully bid on its first contract for construction of an entire semiconductor manufacturing facility for Silmax, Inc. (Silmax), a division of Sumitomo. As petitioner gained experience with process piping its gross revenues began to grow reaching $14 million in 1994, over $24 million in 1995 and 1996, and over $31 million in 1997.

Given the substantial costs the high-tech projects entailed, petitioner found itself facing competition from national rather than local contracting firms for this new line of business. To compete effectively petitioner had to become responsive to the unusual demands of its high-tech construction clients. For example, because of the complexity of the projects and the tight construction timetables those clients demanded, petitioner had to have all of its equipment, personnel, and materials available on

---

[2]Process piping describes the specialized plumbing systems used for semiconductor computer chip manufacturing. These systems differ from conventional plumbing systems in that the piping is constructed from stainless steel or passivated copper and carries either very high purity or dangerous gas or liquid instead of water.

[3]Clean rooms are specially designed manufacturing environments that meet the purity conditions required for semiconductor chip manufacture. When working within them, workers must wear protective clothing to avoid contamination of the worksite. Equipment used within the clean room must be treated with isopropyl alcohol and covered with special taping so it leaves no residue.

demand in order to ensure timely performance.[4]  To meet project deadlines petitioner's personnel often worked more than 5 days per week, at times working double shifts.

Petitioner's new high-tech clients' construction needs were also unpredictable.  Twice one of petitioner's clients suspended or "mothballed" projects when the client's own financial outlook turned bleak.  On other occasions projects that had been awarded to petitioner were canceled by clients who lost financing for the projects they had planned.  One client found its construction needs so unpredictable, and its requirements for rapid completion of an identified need so compelling, that it entered into an annual "retainer" contract with petitioner under which petitioner would maintain a construction management team at the client's disposal and certain equipment on the client's site for rapid deployment when needed.

Because petitioner worked primarily on a competitive bid basis, the nature of its business was such that the company experienced significant changes in the timing, size, number, and types of jobs it performed from year to year.  The volatility in

---

[4]When construction of one of Intel's facilities was at its height, semi trucks were backed up on the freeway outside the Intel site waiting to unload.  If a contractor was not at the dock to unload its materials when the truck arrived, either the truck went to the back of the line or the contractor had to pay someone else to unload.

petitioner's work backlog was a function of many variables only some of which petitioner was able to influence or control.

Consequences of Expansion

Petitioner's early efforts in process piping were successfully completed but costly. Lacking experience at working with the new form of piping in clean rooms, petitioner's management[5] significantly underestimated project costs because they did not fully appreciate the different job skills and the specialized equipment required to install process piping correctly. As a result petitioner incurred a substantial loss on the Silmax project and was, uncharacteristically, unable to complete the project on time.

Petitioner's expansion into process piping also required significant capital investment. To meet its new project management demands petitioner increased the size of its administrative staff from 6 employees in the early 1990s to nearly 20 by the end of August 1997. Petitioner also expanded its facilities, both the offices and the prefabrication shop, to accommodate its new personnel and project work.

---

[5]Used interchangeably herein, the terms "petitioner's management", "petitioner's controlling shareholders", and "petitioner's officers" all refer to petitioner's principals: Kim, Kevin, and Bryan Yearout.

Petitioner financed the purchase of most of its new materials inventory and the new small tools required for work in clean rooms[6] out of working capital or cashflow. Between September 1, 1994, and August 31, 1997, petitioner's capital expenditures from cashflow totaled $1,730,454. To acquire some of the specialized and more costly equipment it required (e.g., orbital robotic welders, facing tools, and trucks),[7] petitioner relied on bank financing.[8]

Petitioner's Financial Condition

By FYE August 31, 1995, petitioner had exhausted its three lines of credit (totaling $1.6 million). In late 1995 petitioner incurred such large losses[9] that its surety company demanded that it reorganize its debt as a condition for maintaining its bonding capacity, and Dun & Bradstreet downgraded petitioner's credit

---

[6]Petitioner had to purchase new small tools because many of its existing tools were not adaptable for use in clean room construction environments.

[7]New trucks were also required in order for petitioner to haul the supplies and materials inventory that would be taken into the clean rooms. These trucks had to undergo specialized cleaning and detailing.

[8]Petitioner had access to both revolving lines of credit and term loan facilities that it used in full to finance these acquisitions.

[9]Petitioner's losses were due, in large part, to the Silmax project and to accounting errors that surfaced following the retirement of the company's longtime chief financial officer.

rating from "fair" to "unbalanced".[10]  Because of concerns about petitioner's ability to successfully manage the rapid growth it was experiencing, petitioner was notified by Sunwest, its bank of long standing, that the bank was no longer willing to extend petitioner short-term, job-specific lines of credit.

In 1996 petitioner received notice that its surety was no longer willing to serve as its bonding agent.[11]  On learning this Sunwest sought reassurances from petitioner's management regarding the steps it was taking to improve its financial condition; for the first time, Sunwest also required that petitioner's officers personally guarantee some of the company's loans.  Throughout 1996 and 1997 petitioner's financing difficulties continued; petitioner's "cash on hand" balance at FYE August 31, 1997, was negative $511,375.  Sunwest agreed to refinance a portion of petitioner's line of credit into long-term debt;[12] but when petitioner twice failed to repay the note when due, Sunwest severed its relationship with petitioner.

---

[10]Before petitioner's business expansion efforts, its credit rating was "good".  As expansion began, spending increased, and bills were paid less promptly, its credit rating was lowered to "fair".

[11]Petitioner was able to find another bonding agent, but whereas petitioner had previously paid $9 per thousand on a declining scale for its bonds, it had to pay a flat $25 per thousand to the new surety in order to secure performance bonds.

[12]As a condition of refinancing, Sunwest also required that petitioner secure the bank's approval before acquiring any additional debt.

Satisfying Petitioner's Equipment Needs Through Rental

Despite its extensive expenditures for materials inventory, new tools, equipment, and facilities expansion, petitioner had additional equipment needs arising from its entry into high-tech construction that could not be met with cashflow or credit. Petitioner's management decided against entering into long-term leases or financing acquisition of the equipment for two reasons: (1) They considered it imprudent to bind petitioner to any new long-term obligations in view of the risks the company faced with respect to its business expansion plans; and (2) they believed petitioner lacked the financial wherewithal to assume additional long-term debt. At the same time, however, management knew that some sort of dedicated access to the necessary equipment would be required for petitioner's business expansion plan to succeed.

Some of petitioner's work was done on a guaranteed maximum price (GMP) basis. On a GMP project petitioner was paid its actual costs (on a time-and-materials basis) plus an agreed markup, not to exceed the maximum price petitioner bid for the project. Thus, petitioner bore the full risk of cost overruns on a GMP project, while the client received the benefit in the event that a project was completed for less than the bid price.

When petitioner worked on GMP projects, its clients permitted a markup of 17.5 percent on rented equipment charges. Petitioner could also charge for the use of all tools and

equipment it owned, but it was not allowed to charge the 17.5-percent markup that was available for rented equipment.  Thus, management determined that renting equipment as needed was petitioner's best option.  However, conditions in Albuquerque's third-party rental market for construction equipment generally made renting equipment through this means infeasible for petitioner.

Third-Party Rental Market Conditions

The 1990s construction boom in Albuquerque was fueled in large part by the decisions of major semiconductor chip manufacturers to build new facilities in Albuquerque, but there were also major road, military base, and commercial laboratory construction projects in the area.  As a consequence the demand for construction equipment exceeded the supply thereof in the third-party rental market from the early 1990s through the taxable years in issue.  It was not uncommon, for example, for companies to rent construction equipment at short-term rental rates for periods of 10 to 12 months or longer.

This excess demand drove rental rates up, and equipment was not reliably available in the third-party rental market, especially on short notice.  Making availability more precarious, some rental companies began to exercise their contractual rights to terminate existing rental agreements when higher rates could be obtained from another customer.

Under the standard third-party rental agreement used in Albuquerque, lessees were charged strictly on a "time-out, time-in" basis. Consequently, lessees incurred charges both for actual use of the equipment and for periods when it was in transit to or between project sites or being prepared for use in a clean room. Third-party rental companies typically offered hourly, daily, weekly, or monthly rates for rental equipment. In many cases rates for longer rental periods reflected a discount from the hourly or daily rates.

In the third-party rental market premium rates were charged for "overtime" equipment use that exceeded 8 hours per day, 5 days per week, or 160 hours per month. Overtime rates were 1.5 times the base rate for double-shift operations, and twice the base rate for triple-shift operations. By contrast, rate concessions were generally not given when equipment was returned before the rental term expired.

Petitioner's Equipment Rentals From Its Shareholders

Cognizant of the excess demand for construction equipment in Albuquerque's third-party rental market, petitioner's controlling shareholders decided to satisfy petitioner's equipment needs by acquiring the necessary equipment themselves and renting it to petitioner. During the taxable years in issue petitioner leased or, in two instances, subleased equipment from its shareholders on primarily an hourly or monthly basis. The rent was generally

paid pursuant to written 5-year agreements originally entered into on or about the dates indicated for the following equipment:

HOURLY RENTALS

| Lessor | Equipment | Make/Model | Date Entered |
|---|---|---|---|
| Kim | Crane | Grove 22-ton | Apr. 93 |
| | Backhoe #1 | John Deere 410C | June 91 |
| | Backhoe #2 | John Deere 410C | Apr. 93 |
| | Manlift #1N | Grove SM 2632E | Apr. 94 |
| | Manlift #1 | Grove SM 2633E | June 92 |
| | Manlift #2 | Grove SM 2632E | July 94 |
| | Manlift #3 | Grove 3158E | May 93 |
| | Manlift #4 | Grove 3158E | July 93 |
| | Manlift #5 | Grove SM 4688 | Aug. 92 |
| | Manlift #6 | JLG CM2033 | Aug. 95 |
| | Manlift #7 | JLG CM2033 | Aug. 95 |
| | Boomlift #6 | Grove MX48B | Aug. 92 |
| Kevin | Cybermation Machine | CFC700A | Dec. 96 |
| Bryan | Bobcat #943 | Melrose 943 | May 88 |
| | Bobcat #743 | Melrose 743B | Oct. 94 |

MONTHLY RENTALS

| Lessor | Equipment | Make/Model | Date Entered |
|---|---|---|---|
| Kevin | Brake Press[1] | LVD 150-ton 150JS13 | Dec. 94 |
| | Clean Room | Intel office site[2] | Sept. 95 |
| Bryan | Lift #1 | Genie 27/48 | June 93 |
| | Lift #2 | Genie IWP-24 | June 93 |
| | Lift #3 | Genie IWP-24 | Mar. 95 |
| | Forklift | Baraga SS-624 | July 95 |
| | Fusion Machine | IR-63 machine/ converter | Apr. 96 |

SUBLEASES

| SubLessor | Equipment | Make/Model | Date Entered |
|---|---|---|---|
| Kevin | LVD Shear | LVD 25/10 HST-C | Feb. 96 |
| Bryan | QuickPen Computer | CAD hardware/ software[3] | May 96 |

[1]While described herein as a single item of equipment, Brake Press was in fact three separate pieces of equipment used to (1) roll, (2) seam, and (3) bend duct.

[2]The record contains a purchase order from Servicor, Inc., to construct a portable modular clean room for Kevin Yearout; other evidence indicates this portable modular clean room was located at the Intel worksite.

[3]CAD denotes computer-aided design.

As noted above, two items of equipment were subleased by petitioner from its shareholders; i.e., the shareholders leased the equipment from third parties (with petitioner as a colessee) and then subleased it to petitioner. LVD Shear was leased by petitioner and Kevin Yearout from Commercial Equipment Leasing Services, Inc., for 4 years, commencing February 27, 1996, at a rate of $1,050 per month with an option to purchase for $1 at the expiration of the lease term. Kevin Yearout subleased LVD Shear to petitioner, commencing February 27, 1996, at a rate of $1,600 per month. QuickPen Computer was leased by petitioner and Bryan Yearout from LINC Anthem Corp. for 5 years, commencing May 30, 1996, at a rate of $2,340 per month with an option to purchase for $1 at the end of the lease term.[13] Bryan Yearout subleased

_____

[13]On brief, respondent contends that Bryan Yearout subleased both QuickPen Computer and Fusion Machine to petitioner. In support thereof, respondent points out that the equipment description on the LINC Anthem master lease agreement indicates Bryan Yearout was leasing QuickPen Computer and IR-63 Fusion Machine. The total equipment cost, however, is listed as $106,000, which other evidence in the record indicates is the cost of QuickPen Computer alone. According to respondent's expert's report, the Fusion Machine at issue was purchased on April 12, 1996, from Plastic Services Southwest, Inc., for $27,062.68, and was simultaneously rented to petitioner at a

(continued...)

QuickPen Computer to petitioner, commencing July 1, 1996, at an initial rate of $2,715 per month.  See infra p. 18.  As the foregoing table indicates, the contract date for each piece of equipment varied, ranging from May 1988 for Bobcat #943 to December 1996 for Cybermation Machine.  Most of the contracts in issue, however, were entered between 1992 and 1994.[14]

Petitioner's contractual rights and obligations with respect to the use of this equipment were memorialized by written agreements in the case of shareholders Kim and Kevin Yearout. Except for Bobcat #943 and QuickPen Computer, there were no written agreements covering petitioner's rentals from shareholder Bryan Yearout; i.e., Bobcat #743, Lift #1, Lift #2, Lift #3, Forklift, and Fusion Machine.

The written rental agreements between petitioner and its shareholders were drafted by Kevin Yearout, a nonlawyer, without legal assistance.  Most of the written agreements had similar terms, to wit:

----

[13](...continued)
monthly rate of $1,900 by Bryan Yearout.  On the record before us, we conclude that the equipment description on the LINC Anthem master lease agreement is incorrect; the lease covered QuickPen Computer only.

[14]The leases for Backhoe #1, Backhoe #2, Manlift #1, Manlift #3, Manlift #4, and Cybermation Machine were renewals of prior rental agreements between petitioner and the respective shareholder lessor.  As illustrated in app. A, these six items of equipment were placed in service either 5 or 10 years before the effective dates of the leases in issue.

(A) The contract term was 5 years;[15]

(B) the rent was generally set at hourly rates;[16]

(C) petitioner had exclusive use of the equipment throughout the term but was generally obligated to pay only for "actual usage";[17]

(D) at the end of the term the equipment reverted to the shareholder lessor;

---

[15]Some of the lease agreements expired before or during the years in issue. The contracting parties' course of dealing, as illustrated in petitioner's annual payment schedules by item of equipment, indicates that these agreements remained in effect as between petitioner and the shareholder lessor despite expiration of the written lease agreement.

[16]As discussed infra, two of the written agreements (for Brake Press and Clean Room) set monthly rates, and the written agreement covering Cybermation Machine set a monthly rate plus an additional amount per hour of use. For five other items of equipment (Lift #1, Lift #2, Lift #3, Forklift, and Fusion Machine) there were no written agreements, but rents were paid on a monthly basis.

[17]Of the 15 items of equipment petitioner rented at hourly rates, 14 had written agreements with "actual usage" provisions. For the one hourly rental without a written agreement (Bobcat #743), petitioner's annual payment records show that petitioner paid for less than full-time use of the equipment, indicating that petitioner was not charged for periods when the equipment was idle. Of the remaining nine items of equipment rented at monthly rates, four had written agreements (Brake Press, Clean Room, LVD Shear and QuickPen Computer) that did not contain "actual usage" provisions; and petitioner's annual payment records show, and its shareholders admit, that petitioner paid for essentially full-time use of this equipment. As noted, five items of equipment were rented on a monthly basis without a written agreement (Lift #1, Lift #2, Lift #3, Forklift, and Fusion Machine). Petitioner's annual payment records show that petitioner paid for less than full-time use in certain years for two of these items (Lift #1 and Lift #2) and paid for full-time use of the rest.

(E) petitioner was liable for "normal" maintenance while the shareholder lessor was liable for "extraordinary" maintenance;

(F) the rental rate was renegotiable annually.

The 5-year lease term was designed to ensure petitioner's unrestricted access to the equipment without regard to the claims of creditors or the shareholder lessors' former spouses.

Brake Press, Clean Room, LVD Shear, and QuickPen Computer were leased or subleased under written agreements at monthly, rather than hourly, rates that were renegotiable annually on the lease anniversary date. Cybermation Machine was leased under a written agreement for a flat fee of $200 per month plus $100 per hour of actual use.

As noted, the record contains no evidence of a written agreement with respect to six items of equipment (Bobcat #743, Lift #1, Lift #2, Lift #3, Forklift, and Fusion Machine) leased to petitioner by Bryan Yearout. However, petitioner's records of payment indicate that all six were rented at monthly rates except Bobcat #743, which was rented at an hourly rate. Petitioner's annual payment schedules by item of equipment indicate that petitioner paid rent for less than full-time use in certain years for three of these items of equipment (Lift #1, Lift #2, and Bobcat #743). See app. A.

Petitioner and its shareholders generally established rental rates on the basis of their industry expertise, their prior

experience with third-party rental companies, and investigation
into current rates being charged for comparable equipment by
third-party rental companies in the Albuquerque area.  Appendix B
summarizes prevailing third-party rental rates[18] in Albuquerque
for listed equipment during the taxable years in issue as well as
petitioner's contract rates with its shareholders.  Appendix A
contains a summary of the rents petitioner accrued and paid to
its shareholders by item of equipment and by calendar year.

In general the rental amounts billed to and paid by
petitioner during the taxable years in issue were consistent with
its written contract rates.[19]  The contract rate for Brake Press
was $3,900 per month, but petitioner was actually billed and paid
$3,686 per month.  Petitioner's initial Clean Room lease was
replaced with a new agreement at a higher rental rate, but the
parties' course of dealing indicates that the higher rate was
never implemented.

---

[18]These rates are based upon the reports of each party's
expert.  Petitioner also offered the testimony of a former
operator of an equipment rental business in Albuquerque during
the years in issue.  However, the figures provided by that
witness, on the basis of his recollections, depart from those
provided by both experts.  We consequently find the experts'
figures more reliable and accept them.

[19]The billing schedules reveal that there were occasional de
minimis deviations from the written lease agreements with respect
to rents paid.  For example, on one day during the taxable years
in issue Manlift #1 was rented for $105 per day rather than the
stated contract price of $6.25 per hour.  The same occurred for
Manlift #2.  Manlifts #1N and #7 were intermittently billed at
$6.50 rather than $6.25 per hour.

The record reflects no other written contract modifications. However, uncontroverted testimony and the parties' course of dealing, as illustrated in petitioner's annual payment schedules by item of equipment, reveal that the parties agreed to modifications to some of petitioner's contracts. From July through September 1996, and again from November 1996 through January 1997, owing to the demands of petitioner's project load during that time, the parties agreed to double payments for the three lifts petitioner leased from Bryan Yearout. During roughly the same time period the parties also agreed to add a temporary $25-per-hour usage rate to the monthly $2,100 rate for Forklift.

As petitioner's workload increased and petitioner's management anticipated that the manlifts and Boomlift #6 would be used on double shifts or 6 to 7 days a week, the contracting parties agreed to switch from hourly to flat monthly rates equal to the original hourly rate times 160 hours. With minor exceptions petitioner was billed at the monthly rate unless the hourly rate produced a lower charge for that month. Finally, while the written lease rate for QuickPen Computer was $2,715 per month, the amount petitioner paid increased to $2,851.20 per month in August 1996, then to $3,421.80 per month in December 1996.

As a result of the "actual usage" term in most of the written rental agreements, petitioner generally incurred a rent

obligation to its shareholders only when the equipment was actually used. Petitioner incurred no rental expense when equipment rented on an hourly basis sat idle because of fluctuations in workloads due to its high-tech clients' unanticipated changes in construction needs, petitioner's lack of success in penetrating the high-tech construction market, or other unforeseen circumstances. As noted, the payment records for the equipment petitioner leased from shareholder Bryan Yearout without a written agreement also reflect that petitioner paid rent for less than full-time use for some of this equipment.

Petitioner's clients had knowledgeable purchasing agents who reviewed petitioner's itemized billings and would have returned bills to petitioner for adjustment if petitioner's billings for equipment rental expense were not in line with the prevailing market rates.

Decisions about whether, or to what extent, any piece of shareholder-owned equipment would be used on a particular project were made by the project foremen without input from the shareholders.

During the taxable years in issue either petitioner's employees or third parties at petitioner's direction and expense performed maintenance on 5 of the 24 items of equipment leased

from its shareholders.[20]  Petitioner kept a detailed maintenance log for each item of equipment.  Those logs indicate that the types of maintenance performed included replacing seats, changing filters, servicing engines, adding fluids, replacing switches, checking tire condition and pressure, reworking harnesses, and rebuilding cylinders.[21]

Respondent's Position

Respondent determined in a notice of deficiency that petitioner's claimed deductions for the rental of property from its shareholders were excessive, and therefore not ordinary and necessary expenses deductible for Federal income tax purposes, to the extent of $125,988 and $381,551 for petitioner's TYE August 31, 1996 and 1997, respectively. This position resulted in deficiencies of $42,836 and $129,727 for 1996 and 1997, respectively.  Respondent's determinations were based upon the report of an Internal Revenue Service valuation engineer (valuation engineer), who concluded that the fair market rent was an amount that would produce a 30-percent return on equity for the equipment petitioner leased from shareholders Kim and Bryan

---

[20]The items maintained by petitioner were Backhoe #1, Backhoe #2, Manlift #4, Bobcat #943, and Forklift.

[21]Nothing in the record establishes which, if any, of these maintenance tasks were extraordinary rather than routine.  We note, however, that the maintenance logs indicate that servicing done by petitioner's employees never took longer than a day to complete.

Yearout and a 35-percent return on equity for the equipment it leased from shareholder Kevin Yearout.  The rate of return differential was appropriate, according to the valuation engineer, because the items Kevin Yearout leased to petitioner were "sophisticated high-tech equipment" that, unlike general construction equipment, was not generally available in the third-party rental market and carried a greater risk of obsolescence.

By amendment to answer respondent asserted that petitioner's claimed deductions were overstated by $340,998 and $522,119 for 1996 and 1997, respectively; i.e., the amounts by which the claimed deductions exceeded what respondent's expert witness contends was the "fair market value of petitioner's five year leasehold interest in construction equipment leased from its shareholders".  The position taken by respondent in the amended answer resulted in increased deficiencies of $115,940 and $177,520, respectively, for 1996 and 1997.

Burden of Proof

During pretrial proceedings respondent informally sought information concerning petitioner's operations, the lease agreements with its shareholders, and its rental expenditures by item of equipment.  When repeated informal requests proved fruitless, respondent sought Court enforcement of his formal discovery requests, which was granted.  Petitioner thereupon provided satisfactory responses.

OPINION

I.   Burden of Proof

Respondent concedes that under Rule 142(a)(1) he bears the burden of proof with respect to the increased deficiencies asserted in his amendment to answer.  With respect to the original deficiencies, petitioner contends that the burden of proof with respect to the factual issues thereunder has shifted to respondent pursuant to section 7491(a) because it has introduced credible evidence bearing on those issues.  We disagree.

To be eligible for the burden-shifting benefits set forth in section 7491(a)(1) a taxpayer must satisfy the substantiation, cooperation, and net worth prerequisites of section 7491(a)(2).  Allnutt v. Commissioner, T.C. Memo. 2004-239; Oatman v. Commissioner, T.C. Memo. 2004-236; H. Conf. Rept. 105-599, at 239 (1998), 1998-3 C.B. 747, 993.  The parties agree that petitioner satisfies the net worth prerequisite, and on the basis of the record we conclude that the rental expense deductions at issue have been substantiated.

The cooperation prerequisite requires that the taxpayer have "cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".  Sec. 7491(a)(2)(B).  Petitioner contends that it cooperated because it did so during respondent's examination for the taxable

years at issue. However, the requirement of cooperation extends through pretrial proceedings. See, e.g., Connors v. Commissioner, 277 Fed. Appx. 122 (2d Cir. 2008), affg. T.C. Memo. 2006-239; Krohn v. Commissioner, T.C. Memo. 2005-145; Lopez v. Commissioner, T.C. Memo. 2003-142, affd. on this issue 116 Fed. Appx. 546 (5th Cir. 2004).

Petitioner argues that it was unable to provide the information and documents requested during pretrial proceedings because it did not maintain its records in the format respondent requested; i.e., by item of equipment. Petitioner has at no point asserted that the material sought was confidential or proprietary business information, see Kohler v. Commissioner, T.C. Memo. 2006-152, and we are unpersuaded by the justification asserted. The material petitioner resisted producing was necessary to substantiate its claimed rental expense deductions. See sec. 6001; sec. 1.6001-1(a), Proced. & Admin. Regs. Petitioner's failure to comply with informal and formal discovery covering reasonable requests for information and documents, resulting in Court-enforced discovery, precludes a finding that it cooperated for purposes of section 7491(a)(2)(B). See AMC Trust v. Commissioner, T.C. Memo. 2005-180; Rinn v. Commissioner, T.C. Memo. 2004-246. Accordingly, the burden of proof does not shift to respondent with respect to the factual issues relevant to the originally determined deficiencies.

II.  Petitioner's Rent Deductions for Shareholder-Owned Equipment

Deductions are a matter of legislative grace.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Therefore, petitioner bears the burden of proving that it is entitled to the deductions claimed and of substantiating the amount and purpose of those deductions.  Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Section 162 permits a taxpayer to deduct all ordinary and necessary expenses paid during the taxable year in carrying on its trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession" of property.  Sec. 162(a)(3).  In determining whether the payments in issue are deductible under section 162, the basic question is whether the payments were in fact rent and not something else disguised as rent.  See Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952); accord Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 715 (1977).  This is a question of fact, and the character of the payments in question is to be judged in view of (1) all the terms and conditions of the agreement establishing the obligation to pay, and (2) all the facts and circumstances existing at the time the agreement was made.  See Audano v. United States, 428 F.2d 251, 256 (5th Cir. 1970); Brown Printing

Co. v. Commissioner, 255 F.2d 436, 440 (5th Cir. 1958), revg. T.C. Memo. 1957-37.  When, as here, the lessor and lessee are related, an inquiry into what constitutes "reasonable" rent becomes necessary to determine whether the amount paid is greater than the lessee would have paid had he dealt with a stranger at arm's length.  Brown Printing Co. v. Commissioner, supra at 438; Place v. Commissioner, supra at 203.

A.   Business Reasons for Petitioner's Equipment Rentals From Its Shareholders

In the early 1990s petitioner faced a substantial new business opportunity in the form of expansion into the field of high-tech construction brought on by the influx of high-tech manufacturers in the Albuquerque area.  To avail itself of that opportunity, however, required substantial expenditures. Petitioner made those expenditures--for additional staff, larger offices, an expanded prefabrication shop, new small tools, materials inventory, new trucks, and specialized equipment-- largely out of working capital and its lines of credit (up to capacity) with its bank.  Nonetheless petitioner still had substantial construction equipment needs to satisfy in order to be competitively positioned to enter the high-tech construction market.

Given certain features of that market in the Albuquerque area at the time, petitioner's equipment needs were to some extent unusual.  Critical features of the construction of high-

tech manufacturing facilities were extraordinary pressure from clients to get projects completed and "on line" quickly because of the competitive pressures the clients faced to bring new products to market expeditiously, and volatility in the clients' construction needs. In addition, because the equipment was to be used in clean room environments, it had to be specially prepared and maintained for this purpose. Thus, given the time constraints and special conditions for its use, petitioner essentially needed guaranteed, exclusive access to the equipment used for high-tech construction projects to meet the demands of its clients.

The conventional means for petitioner to obtain equipment were purchase, long-term lease, or short-term rental. Because petitioner consumed its cashflow and working capital acquiring materials, tools, trucks, certain equipment, working space, and staff, purchasing the remaining necessary equipment would have required petitioner to assume additional indebtedness. To the extent petitioner had any remaining borrowing capacity, petitioner's management did not consider it prudent to incur additional debt given the uncertainty of whether petitioner would succeed in its new line of business. For the same reasons petitioner's management did not believe long-term leases were

feasible.[22]  With respect to both additional debt and long-term leases, petitioner's management was reluctant to encumber petitioner with substantial long-term obligations in connection with "tooling up" for the high-tech market as petitioner's eventual success in that market was uncertain.

Short-term rentals of equipment from third-party rental companies on an "as needed" basis so that petitioner could perform under the construction contracts it obtained also presented substantial drawbacks.  The short-term rental market for general construction equipment in the Albuquerque area was overheated in the early 1990s as a result of the influx of high-tech construction and other projects; shortages were prevalent, equipment could not be obtained on short notice, and lessors were increasingly exercising early termination rights and reclaiming equipment when higher rents could be secured elsewhere. Moreover, equipment obtained on a "spot" basis through short-term rentals required extensive preparation for clean room use.  Thus, short-term rentals did not present a reliable or especially

---

[22]According to expert testimony in the record, a long-term capital lease is often referred to as a conditional sales contract because the lease payments create the same kind of obligation as interest payments on debt.  A capital lease is usually classified as a purchase by the lessee because it is essentially a bank loan with a buyout at the end; i.e., the lessee makes an agreed number of fixed, monthly payments over the contract period and then acquires the asset for a nominal amount at the conclusion of the lease term.  Consequently, long-term leases would impair petitioner's financial condition in the same manner as purchases made with borrowed funds.

feasible means of meeting petitioner's equipment needs for entering the high-tech construction market, in management's view. Yet management also recognized that if a reliable supply of rental equipment were available, the somewhat greater expense associated with short-term rental rates versus long-term lease rates would be mitigated by the fact that petitioner's contracts with its high-tech construction clients entitled petitioner to bill those clients for equipment rental at cost plus a 17.5-percent markup.

Against this backdrop, petitioner's management concluded that petitioner's general construction equipment needs for the high-tech market expansion could best be met if its shareholders acquired the equipment and leased it to petitioner under lease or rental agreements[23] specially tailored to petitioner's circumstances. Specifically, the agreements had 5-year terms to guarantee petitioner's exclusive access to the equipment and to protect petitioner's access as against the claims of the shareholders' former spouses or creditors. However, petitioner was generally obligated to pay its shareholders only for actual use. That is, under the "actual usage" terms employed in petitioner's hourly rate agreements, petitioner incurred rent

---

[23]Our use of the term "lease agreement" or "rental agreement" is not intended to confirm or rebut respondent's contention that petitioner held a "5-year leasehold interest" pursuant to the contracts covering petitioner's compensation of its shareholders for the use of equipment they owned.

obligations based on the number of hours the equipment was actually in use at a job site.[24] With respect to the items of equipment rented at a monthly rate, petitioner's payments were equal to the cost of full-time use for the equipment subject to a written agreement (Brake Press, Clean Room, LVD Shear, and QuickPen Computer). However, with respect to the five items of equipment rented at monthly rates without a written agreement, petitioner's actual payments for two items (Lift #1 and Lift #2) were less than the cost of full-time monthly use, indicating that petitioner did not pay for periods when the equipment was idle.

As a consequence, petitioner generally incurred no obligation for rent for periods when the equipment was idle or in transit, although under petitioner's exclusive control. Thus, the rental agreements between petitioner and its controlling shareholders were hybrid arrangements, containing both features of long-term (5-year) leases such as the "exclusive use" feature, and features of short-term rental agreements such as the "actual usage" provision that generally protected petitioner from the long-term obligations of such a lease.[25] In this way, most of

---

[24]One item of equipment rented on an hourly basis, Bobcat #743, did not have a written agreement covering the rental terms. However, the payment schedule demonstrates that petitioner paid for less than full-time hourly use, indicating that petitioner did not pay for periods when the equipment was idle.

[25]Two of the twenty-four items of equipment for which the rent payments are at issue involved arrangements where petitioner

(continued...)

petitioner's agreements more closely resembled the obligation that petitioner would have incurred under short-term rental contracts in the third-party rental market.

The rental payments at issue, although claimed as deductions for petitioner's TYE August 31, 1996 and 1997, were made pursuant to agreements that, for 19 of the 24 items of equipment, were entered into before the taxable years in issue; i.e., between 1991 and the first 8 months of 1995. This period encompassed petitioner's initial efforts to penetrate the high-tech construction market and the onset of petitioner's financial difficulties. The remaining five contracts were entered into or renewed during petitioner's 1996 taxable year, when its financial difficulties from its rapid growth and the Silmax contract were acute.

We are satisfied that petitioner had valid business reasons for these arrangements. Petitioner's management determined that additional long-term debt or comparable commitments under long-term leases were imprudent for purposes of entering an untested line of business.[26] Petitioner's management likewise considered

---

[25](...continued)
and a shareholder initially coleased equipment and the shareholder then subleased the equipment to petitioner at a premium. Those arrangements are discussed infra pp. 46-53.

[26]Petitioner's management's conservatism regarding longer term commitments in the early 1990s proved well founded, as petitioner encountered financial difficulties attributable in

(continued...)

short-term rentals infeasible because of the shortages and other uncertainties that had arisen as a result of an overheated short-term general construction equipment rental market. The solution was hybrid agreements that guaranteed petitioner access to equipment it would need if it were successful in obtaining high-tech projects without the financial burdens of carrying the cost of acquired or long-term leased equipment in the event its contemplated work did not materialize or could not be performed profitably. The financial risk of owning equipment that was not deployed on projects was borne by petitioner's shareholders rather than petitioner, a reallocation of the financial risk underlying petitioner's capital needs that is not entirely unlike the transfer of risk to a shareholder who provides a guaranty for his corporation's debt. Accordingly, if the payments petitioner made under its hybrid agreements were reasonable, they constitute deductible rent. See Roman Systems, Ltd. v. Commissioner, T.C. Memo. 1981-273.

---

[26](...continued)
significant degree to its miscalculations under one of its first large high-tech construction projects, Silmax. By 1995 the financial difficulties associated with expansion and the Silmax project culminated in petitioner's credit rating being significantly downgraded, its longtime banker severing its relationship with petitioner, and its surety refusing to write any further performance bonds for petitioner. Had petitioner incurred indebtedness or assumed long-term leases to obtain the equipment at issue, its precarious financial condition would no doubt have arisen earlier and been significantly worse.

B.  Were Petitioner's Rental Payments "Required"?

Having concluded petitioner had valid business reasons for renting at short-term rates rather than purchasing or entering long-term leases for the construction equipment it needed, we must now decide whether the rental payments petitioner made were "required" within the meaning of section 162(a)(3).  Since the rental agreements at issue were between related parties, we must determine whether, in view of the agreements' terms and the facts and circumstances existing at the time the agreements were made, the amounts paid as rent were reasonable; i.e., not more than petitioner would have been required to pay as the result of an arm's-length bargain.  Brown Printing Co. v. Commissioner, 255 F.2d at 438, 440; Place v. Commissioner, 17 T.C. at 203.

Respondent, emphasizing the 5-year terms of the agreements, contends that petitioner had a "5-year leasehold interest" in each item of equipment and that arm's-length payments for that interest would equal the approximate fair market value of payments under a 5-year bank loan, capital lease, or true lease[27] for the acquisition or use of the equipment.  Moreover, respondent contends, rentals of general construction equipment

---

[27]A capital lease is, in a economic sense, an agreement to purchase over time whereby the lessee, after making "lease" payments over a stated period, becomes entitled to acquire the asset from the lessor at a nominal cost.  See supra note 22. Under a true lease, also known as an operating lease, the lessee pays to use the asset during the lease term but has no option to purchase at the term's expiration.

are not available in the third-party rental market for 5-year terms; the longest rate term generally available is monthly or quarterly. Expert testimony in the record corroborates this point. Thus, respondent concludes, amounts petitioner paid as rent that exceeded the fair market value of a 5-year leasehold interest in the equipment do not represent an arm's-length price for the use of the equipment, are excessive, and are accordingly not deductible under section 162(a)(3).[28]

Petitioner argues that the "actual usage" term of its agreements resulted in the agreements' more closely resembling "at will" or short-term rental agreements. The "actual usage" feature was a material term of most of its contracts, petitioner argues, made necessary by petitioner's particular needs and risks. Thus, in petitioner's view, the rental payments that it made to its shareholders, which were based on hourly or monthly short-term rates, were required to secure the equipment on the terms petitioner needed and are therefore fully deductible.

---

[28]Respondent also argues that petitioner's rental deductions are excessive because its employees performed "extensive maintenance and rebuilding" on the leased equipment. As noted supra note 21, the record establishes that none of the maintenance performed on the rented equipment took more than a day to complete. In any event, in view of the limited amount of maintenance performed during the taxable years in issue as compared to the number of items of equipment rented and the significant number of hours the rented equipment was used by petitioner, we find that any maintenance expense petitioner incurred that was the contractual responsibility of the shareholder lessors was de minimis.

Expert testimony, as summarized in appendix B, confirms that the hourly and monthly rates petitioner paid to its shareholders were generally consistent with or below rates in the short-term rental market in the Albuquerque area at the time.

After a careful review of the expert testimony and the other evidence in the record, including the particulars of the rental agreements and petitioner's course of dealing thereunder with its shareholders, we agree with petitioner.

### 1. Increased Deficiencies Asserted in the Answer

We note as a threshold matter that while respondent's contention that petitioner had a 5-year leasehold interest in the rented equipment has some support in the case of the equipment that was subject to written leases with 5-year terms, the same cannot be said for the six items of equipment for which there were no written leases; namely Bobcat #743, Lift #1, Lift #2, Lift #3, Forklift, and Fusion Machine. For this equipment, where there was merely a course of dealing between petitioner and its shareholders reflecting rental payments at hourly or monthly rates, respondent's claim that petitioner had a 5-year leasehold interest is tenuous at best.

With respect to the equipment subject to written leases, a principal defect in respondent's contention that the arm's-length rate for petitioner's rent was equal to the cost of a 5-year leasehold interest is the premise that petitioner in fact could

have obtained the equipment pursuant to long-term leases. Petitioner has adduced persuasive evidence that it lacked financial wherewithal or creditworthiness to do so during the relevant period. Petitioner had already employed bank financing for other equipment and consumed cashflow and working capital addressing other capital needs. During the period when the rental agreements at issue were entered into, petitioner's financial condition evolved from a situation (in the early 1990s) where its management considered additional debt or long-term lease commitments for this equipment to be merely imprudent, given petitioner's inexperience in high-tech construction, to a situation where petitioner's inability to borrow or obtain long-term leases was obvious--that is, by early 1996 when its long-time banker and surety both abandoned petitioner as a client. In sum, petitioner's financial condition precluded its obtaining 5-year leases for the equipment at issue.

Respondent suggests on brief that this problem could have been remedied by the shareholders' giving their personal guaranties for petitioner's indebtedness or long-term leases used to secure the equipment. But such arrangements would not have been arm's length unless the shareholders were compensated for this assumption of risk. Here, instead of providing personal guaranties to enable petitioner to acquire equipment, petitioner's shareholders acquired the equipment themselves and

leased it to petitioner.  In our view, arm's-length rental rates in these circumstances would be set at some level <u>above</u> what would be paid for a 5-year leasehold interest in order to compensate the shareholders for the risk they assumed in the transaction; petitioner was entering an untested line of business and, as a practical matter, the rent might not be paid.  See <u>Roman Systems, Ltd. v. Commissioner</u>, T.C. Memo. 1981-273.

Because we are not persuaded that petitioner could have obtained the equipment at issue for payments approximating the cost of 5-year leasehold interests, respondent has failed to meet his burden of proof with respect to the increased deficiencies asserted in the amendment to answer.  Consequently, those increased deficiencies are not sustained.

### 2.  Original Deficiency Determination

The notice of deficiency determined that petitioner's maximum allowable rent deduction was an amount that would provide shareholders Kim and Bryan Yearout a 30-percent rate of return on equity, and shareholder Kevin Yearout a 35-percent return, on the items of equipment each leased to petitioner.  The valuation engineer reached this conclusion in part by analyzing what petitioner would have paid if it had rented the equipment from a third-party rental company at monthly, rather than daily or hourly, rates and in part by assuming that returns on equity of 30 to 35 percent were reasonable expectations in the Albuquerque

market.  Respondent did not support or defend this methodology at trial or on brief, devoting his arguments instead to the "5-year leasehold interest" methodology advanced by his expert and used to compute the increased deficiencies asserted in the amendment to answer.  We accordingly conclude that respondent has abandoned the methodology and analysis underlying the notice of deficiency.  Consequently, we must decide whether the original deficiency determinations can be sustained on the "5-year leasehold interest" methodology advanced by respondent and his expert at trial.

### a.  Equipment Leased at Monthly Rates

With respect to the seven rental agreements under which petitioner paid a monthly rate,[29] appendix B lists petitioner's rental rates and the prevailing rates in the third-party rental market for similar equipment according to the expert witnesses.  The report and testimony of respondent's own expert establish that the monthly rates petitioner paid for Lift #1, Lift #2, Lift #3, and Forklift were less than the rates being charged for those items of equipment by third-party rental companies.

Respondent's expert failed to provide an estimate of fair market rental value for Brake Press, Clean Room, and Fusion

---

[29]The items rented at monthly rates were Brake Press, Clean Room, Lift #1, Lift #2, Lift #3, Forklift, and Fusion Machine. The subleased items of equipment that were rented at monthly rates, LVD Shear and QuickPen Computer, are discussed infra pp. 46-53.

Machine.  Petitioner relies on the rates estimated by its expert
to illustrate that the rates it paid for these items of equipment
were either comparable to or below the rates available in the
third-party rental market.[30]  Consistent with the aforementioned
findings of respondent's expert, petitioner's expert's estimates
of the monthly third-party rental rates for this equipment were
higher than those petitioner was charged by its shareholders; in
the case of Brake Press, substantially more.  The 5-year terms of
the monthly rate agreements negotiated at arm's length might be
expected to exert some downward pressure on the amount a lessor
would charge; the fact that petitioner's shareholders generally
charged it less than prevailing third-party rental rates for
month-to-month arrangements indicates that the 5-year term did,
in fact, affect rates in the direction of an arm's-length rate.

In addition, with respect to certain monthly rental
arrangements that did not have written agreements, petitioner's
annual payment schedules by item of equipment demonstrate that
petitioner paid for less than full-time use of Lift #1, Lift #2,

---

[30]Petitioner's expert surveyed local and national third-
party rental companies to determine average monthly rental rates
for widely available construction equipment.  For items of
equipment not generally available from third-party companies,
petitioner's expert contacted other local users of similar
equipment to determine average rental rates.  In all instances,
the rates relied upon were for equipment that was similar, if not
identical, to petitioner's; i.e., in job-ready condition and
meeting all code and safety requirements.  We find the
methodology employed by petitioner's expert to be sound.

and Forklift during some years.  We conclude that, in practice, petitioner paid only for actual use of this equipment in a manner similar to the arrangements under the written agreements covering hourly rentals of equipment.  See app. A.  Since "actual usage" terms were in practice applied in these monthly agreements, the shareholder lessors were subjected to another element of risk for which they were entitled to be compensated.  Rental rates that were closer to short- rather than long-term rates did so.

Given that (1) petitioner has shown that it was infeasible for petitioner to obtain conventional long-term leases for this equipment (as discussed supra pp. 34-36), (2) the expert evidence demonstrates that the amounts petitioner paid its shareholders to lease equipment at monthly rates were generally less than amounts that were charged by third-party lessors for the same equipment, and (3) in actual practice, petitioner was not required to pay when at least some of the equipment rented at monthly rates was idle, we conclude that petitioner has carried its burden of proving significant error in the notice of deficiency determination that these rental payments were excessive. Instead, we find by a preponderance of the evidence that the monthly rents petitioner paid were reasonable.  Accordingly, the rental payments made pursuant to the seven monthly agreements and claimed as deductions for the years in issue are allowable under section 162(a)(3).

### b. Equipment Leased at Hourly Rates

With respect to the 15 items of equipment petitioner leased on a hourly basis, there is an additional problem with respondent's position that the deductible portion of petitioner's rent payments should be limited to the value of a 5-year leasehold interest in the equipment. Respondent's equating of petitioner's rental agreements with a 5-year leasehold interest takes no account of the "actual usage" term present in those agreements. Respondent contends that the "actual usage" term is properly disregarded because it had "no value". Respondent argues that

> because the unprecedented construction boom kept petitioner so busy, petitioner could not realistically have ceased using any of the equipment. Because petitioner's argument that it could stop further accrual of liability at any time by ceasing to use the equipment is contrary to the weight of evidence, this ["actual usage"] term is of no value.

We disagree. Respondent reaches the conclusion that petitioner could not realistically have ceased using the equipment on the basis of conditions as they existed during the taxable years at issue. However the rental payments in dispute were made pursuant to agreements that were, for the most part, entered into during the 4 years before the taxable years in issue. During that period petitioner was hoping to exploit the new business opportunities presented by the advent of high-tech

construction clients, but it could not be certain that its efforts would be successful.

As it turned out, petitioner in fact was able to secure substantial high-tech business and was essentially working overtime to perform under its contracts during the years in issue. But this outcome could not be foreseen with any certainty in 1992 or 1993 when the bulk of the contracts were entered into; indeed, it occurred only after a near-ruinous start, represented by the Silmax project, that had a significant adverse impact on petitioner's creditworthiness during the years in issue.

By assessing the reasonableness of petitioner's contracts as of the taxable years in issue, when petitioner had established a successful reputation as a high-tech manufacturing contractor and was regularly working overtime to satisfy project commitments in a booming market, respondent engages in the kind of hindsight that is not permitted in determining whether rent is deductible under section 162(a)(3); rather, the reasonableness of an agreement's terms generally must be assessed at the time the agreement was entered into, without the benefit of hindsight, considering all the facts and circumstances existing at that time. See Audano v. United States, 428 F.2d at 256; Brown Printing Co. v. Commissioner, 255 F.2d at 438; Stanley Imerman v. Commissioner, 7 T.C. 1030, 1037 (1946); Estate of Sullivan v.

Commissioner, a Memorandum Opinion of this Court dated Aug. 10, 1951.

When all the facts and circumstances that existed at the time petitioner's agreements were entered into are considered, we are not persuaded that the "actual usage" terms had no value. The uncontroverted evidence is that petitioner's high-tech clients' construction needs were difficult to predict. Petitioner's competence in performing the new type of work was untested at the time that many of the contracts were entered into. Later, when petitioner's competence was better established, there was no certainty that demand for high-tech construction would continue at the "boom" levels that characterized the 2 taxable years at issue. We are persuaded that the "actual usage" terms were an important hedge against petitioner's downside risks in pursuing a new line of business.

Petitioner's actual experience under its rental agreements corroborates the significance of the "actual usage" provisions. Had it been the case that petitioner used the equipment essentially full time during the 5-year terms of the contracts, respondent's position that the "actual usage" provisions should be disregarded might be more persuasive. But that is not what happened.

As illustrated in appendix A, with respect to 13 of the 15 items of equipment rented at hourly rates with "actual usage"

provisions, petitioner used the equipment significantly less than full time; in many years actual use was less than 50 percent of full-time use.  Petitioner accordingly paid its shareholders significantly less than short-term rates premised on full-time use for these items of equipment.[31]  Given that the "actual usage" provisions had a significant impact on the amounts petitioner was required to pay its shareholders for exclusive annual use, they cannot be disregarded as respondent contends.[32]

A 5-year lease with an "actual usage" provision, such as those between petitioner and its shareholders, is not essentially equivalent to a conventional long-term lease with a 5-year term as respondent contends because in the former the risk of the equipment's nonuse has been shifted from the lessee to the lessor.  The lessor in such an arrangement bears a risk similar to that of the lessor in a short-term equipment rental; for the

---

[31]Petitioner also achieved savings, notwithstanding paying short-term rates, for any time that a piece of equipment was in transit between jobs or being prepared for clean room use as these periods did not constitute actual use.  Thus, the shareholder lessors received no rent for these periods, although a conventional short-term lessor would have.

[32]In examining petitioner's experience under the rental agreements after they were executed, we do not depart from the principle that the reasonableness of the agreements must be assessed at the time they are entered into and in view of the conditions then existing.  Instead, the actual experience under the agreements gives rise to reasonable inferences concerning what the parties to the agreements anticipated when they were entered into, including the inference that the possibility of less than full-time use was anticipated.

periods the equipment is not in use, the lessor is not compensated and accordingly must recoup the idle periods by way of a premium charged for periods of actual use. A lessor in a long-term lease bears no such risk, and his arm's-length rate is accordingly less.

We are therefore not persuaded of respondent's position that an amount equivalent to the rent that would be paid on a conventional 5-year, long-term lease for the equipment is the amount that would be paid under an arm's-length arrangement for the rights that petitioner obtained under the hourly rate leases with its shareholders.[33] Instead we are persuaded that, in an arm's-length arrangement, lessors such as petitioner's shareholders would have demanded short-term rates to compensate for periods of nonuse and would have been willing to assume the

---

[33]There are other substantial problems with the figures that respondent asserts are the values of petitioner's 5-year leasehold interests in the equipment at issue. In computing these figures, respondent's expert used interest rates prevailing at the time his report was prepared rather than those prevailing some 10 years earlier when the agreements were made. The record establishes that the rates in effect at the time petitioner's rental agreements were entered into were considerably higher than those in effect 10 years later. Additionally, respondent computed residual values using fair market value at the end of the lease term. According to petitioner's rebuttal expert, a member of the American Society of Appraisers with a specialty certification in machinery and equipment appraisal, typical lessors compute residual value on the basis of orderly liquidation value, which is between 15 and 25 percent less than fair market value, and determine residual value at the beginning of the lease term rather than the end, thereby eliminating the effects of inflation during the lease years.

risk of periods of nonuse so long as they could reasonably predict that the lessee's actual use of the equipment would be significant over the lease period. Petitioner's shareholders obviously possessed sufficient knowledge of petitioner's business prospects to make an informed judgment that petitioner's actual use of the equipment would likely be sufficient for them to earn a reasonable return on their investment over time.

Conversely, petitioner's side of the bargain was also arm's length in our view; petitioner obtained exclusive use of the equipment without assuming the downside risks posed by indebtedness or long-term leases in the event that petitioner did not succeed in a new venture. Moreover, petitioner could pass along the costs of short-term rental rates to its clients, with a 17.5-percent markup, alleviating the burden of heavy use at short-term rates.

In sum, we are persuaded that in petitioner's circumstances, the payment of essentially short-term rental rates for long-term use of the equipment was within the range of what would have been paid in an arm's-length arrangement to secure the same rights. Because the expert evidence demonstrates that the amounts petitioner paid its shareholders to lease equipment at hourly rates were generally less than amounts that would be charged by third-party lessors for the same equipment, we conclude that petitioner has carried its burden of proving significant error in

the notice of deficiency determination.  Instead, we find by a preponderance of the evidence that the hourly rents petitioner paid were reasonable.  Accordingly, the rental payments made by petitioner pursuant to the 15 hourly agreements and claimed as deductions for the years in issue are allowable under section 162(a)(3).

### c.  Equipment Subleased

Petitioner and shareholder Kevin Yearout entered into an agreement in February 1996 to colease LVD Shear for 4 years at a rate of $1,050 per month with an option to purchase for $1 on the lease expiration date.  Kevin Yearout simultaneously subleased LVD Shear to petitioner at a rate of $1,600 per month.  In the notice of deficiency respondent determined that the maximum rent allowable for LVD Shear was $1,470 per month.[34]

Petitioner and shareholder Bryan Yearout entered an agreement in May 1996 to lease QuickPen Computer for 5 years at a rate of $2,430 per month, with an option to purchase for $1 at the expiration of the lease.[35]  Bryan Yearout subleased QuickPen

_____

[34]The maximum rent allowable was computed by multiplying LVD Shear's total acquisition cost of $50,400 by 35 percent (the rate of return on equity attributed to Kevin Yearout) and dividing the result by 12 to yield a monthly rental rate.  (The reports of both experts confirm that LVD Shear's total acquisition cost was $50,400, although the initial cost specified on the master lease agreement with the primary lessor was $41,190.)

[35]As noted in our findings of fact, respondent's conclusion that a single lease agreement covered both QuickPen Computer and
(continued...)

Computer to petitioner in July 1996 at rates ranging from $2,715 to $3,422 per month. In the notice of deficiency respondent determined that the maximum rent allowable for QuickPen Computer was $2,650 per month.[36]

Respondent, citing Connelly v. Commissioner, T.C. Memo. 1994-436, affd. without published opinion 99 F.3d 1154 (11th Cir. 1996), argues on brief that when a sublessee pays more for equipment than the sublessor pays its own lessor (under a lease-to-own contract), it is an indication that the rate being paid by the sublessee is above fair market value.[37] The gravamen of

---

[35](...continued) Fusion Machine is belied by the purchase price listed on the agreement, which represents the cost of the computer alone.

[36]The maximum rent allowable was computed by multiplying QuickPen Computer's initial acquisition cost of $106,000 by 30 percent (the rate of return on equity attributed to Bryan Yearout) and dividing the result by 12 to yield a monthly rental rate.

[37]Respondent also argues, for the first time on brief, that petitioner has not proved that the respective shareholders acquired petitioner's leasehold interests in the originally coleased equipment (i.e., LVD Shear and QuickPen Computer) before subleasing it back to petitioner. A party may not raise an issue for the first time on posttrial brief where surprise and prejudice are found to exist. See Sundstrand Corp. v. Commissioner, 96 T.C. 226, 346-347 (1991); Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Markwardt v. Commissioner, 64 T.C. 989 (1975). Since respondent did not raise the issue of the transfer of petitioner's colessee interests until after trial, petitioner had no opportunity to address it. Allowing the issue to be raised at this point would prejudice petitioner, and we therefore decline to do so.

(continued...)

respondent's argument is that petitioner could have leased LVD Shear and QuickPen Computer directly from the primary lessors; it was therefore unnecessary for petitioner to enter into subleases with its shareholders for the equipment at higher rates than were paid to the primary lessor. Therefore, respondent concludes, the lease rates paid by the shareholders directly to the primary lessor are the best evidence of fair market value for those items.

Petitioner argues that any premiums paid to the shareholders under the subleases are justified by the risks the shareholders assumed as colessees, relying on Roman Sys., Ltd. v. Commissioner, T.C. Memo. 1981-273. Petitioner contends that amounts paid to its shareholders under the subleases that exceeded the rents due under the primary lease were compensation for the shareholders' assumption of risks as guarantors of the primary lease payments and as sublessors in respect of tort claims (for which they would not have been responsible as shareholders).

---

[37](...continued)
    Even if we allowed the issue to be raised, we would conclude on this record, in view of petitioner's precarious financial condition when the leases and subleases were entered into, that petitioner and its shareholders had informal agreements in respect of the leased equipment under which petitioner agreed (1) to transfer its rights as colessee to the colessee shareholders, and (2) to sublease the equipment from the shareholders at a premium, in consideration of the shareholders' effectively serving as guarantors of petitioner's obligations under the primary lease.

We agree with petitioner.  Respondent's contention that petitioner could have obtained LVD Shear and QuickPen Computer directly--that is, without a shareholder serving as colessee--finds no support in the record.  When petitioner acquired the use of these items in 1996, its surety had ceased writing performance bonds and its longtime banker had begun, for the first time, to require petitioner's shareholders to provide personal guaranties for petitioner's indebtedness.  Contrary to respondent's argument, petitioner's financial condition in 1996 strongly supports the inference that the primary lessors of LVD Shear and QuickPen Computer would not have entered into leases without Kevin and Bryan Yearout as colessees, respectively--in substance, the same condition being imposed by petitioner's banker for loans.

Given these circumstances, petitioner's position is akin to that of the taxpayer in Roman Sys., Ltd. v. Commissioner, supra, where we rejected an argument very similar to respondent's.  In Roman Systems, the taxpayer was "an unproven corporation embarking on a type of business venture which had a high failure rate."  Id.  The taxpayer needed a building for its proposed restaurant operation, but the building's owners were unwilling to lease the building to the taxpayer on the basis of the taxpayer's credit alone.  Two of the taxpayer's shareholders therefore formed a partnership that entered into a lease with the

building's owners and then subleased the building to the taxpayer at a higher rate. The Commissioner argued that the taxpayer could have leased directly from the owners and that consequently the amounts paid under the sublease to the shareholder partnership that exceeded what the partnership paid under the primary lease was not rent for purposes of section 162(a)(3). This Court concluded that the additional amounts paid under the sublease served to compensate the shareholders for their assumption of risk and that these amounts were deductible as rent so long as they did not exceed what would have been paid in an arm's-length arrangement.

The same analysis should apply here, because petitioner's shareholders effectively served as guarantors for the rental payments to the primary lessor. For the same reason, Connelly v. Commissioner, supra, relied on by respondent, is distinguishable. In that case, the taxpayer argued that the amounts it paid as sublessee that exceeded what its sublessor paid to the primary lessor were compensation for improvements made to the leased property by the sublessor. We denied the section 162(a)(3) deduction for the excess payments because there was no persuasive evidence that the sublessor had made the improvements as claimed by the taxpayer. Here, petitioner's claim that its shareholders provided their creditworthiness in connection with the subleasing arrangements is supported by the evidence.

Regarding the fair market rental value of LVD Shear, respondent argues that the most reliable measure of fair market rental value is what was paid in the arm's-length arrangement between the primary lessor and colessees petitioner and Kevin Yearout; namely $1,050 per month. Following Roman Sys., Ltd. v. Commissioner, supra, we disagree, since this figure does not reflect any compensation to Kevin Yearout for the guarantor risk he assumed as colessee. Respondent's valuation engineer took the position that fair rental value for LVD Shear was the amount that would secure a 35-percent return on equity for Kevin Yearout, or $1,470 per month. Petitioner's expert's estimate of the fair rental value of LVD Shear in the Albuquerque market during the taxable years in issue was $4,500 per month; respondent offered no expert testimony on this point.

We believe some doubt necessarily attaches to petitioner's expert's estimate, given that petitioner and Kevin Yearout were able to lease LVD Shear for $1,050 per month. We nonetheless find that, in view of respondent's valuation engineer's estimate that $1,470 per month was a reasonable rent, the $1,600 per month petitioner paid as sublessee to Kevin Yearout was a reasonable amount to compensate Kevin Yearout for his risk as guarantor, given petitioner's precarious financial condition when the lease

and sublease were executed.[38]  We therefore conclude that petitioner has met its burden of proving that the $1,600 per month petitioner paid to shareholder Kevin Yearout to sublease LVD Shear was within the range of fair market rental value and was arm's length.  The deficiency determined with respect to this item is therefore not sustained.

Regarding the fair market rental value of QuickPen Computer, respondent likewise takes the position that the best measure of that value was the rent paid under the arm's-length arrangement between the primary lessor and colessees petitioner and Bryan Yearout; namely, $2,430.  For the reasons just stated with respect to the LVD Shear sublease, we reject respondent's contention.  Respondent's valuation engineer took the position that fair rental value for QuickPen Computer was the amount that would secure a 30-percent return on equity for Bryan Yearout's investment of $106,000, or $2,650 per month.  The valuation engineer also expressed the view, however, that a 30-percent return was appropriate for general construction equipment but that a 35-percent return was appropriate for high-tech equipment. We find that QuickPen Computer more likely falls in the latter

---

[38]We also note that the rents being charged petitioner by its shareholders were subject to review by knowledgeable purchasing agents of petitioner's clients.  The undisputed testimony was that, under the typical GMP construction contracts petitioner had with its clients, these purchasing agents were quick to reject any claimed expenses for equipment rental that they considered in excess of prevailing rates.

category.  A 35-percent return on equity would suggest that fair market rental value under the valuation engineer's methodology would be $3,091.67 per month (($106,000 x .35) ÷ 12).

Respondent offered no expert testimony as to the fair rental value of QuickPen Computer.  Petitioner's expert estimated that the fair market rental value of QuickPen Computer in Albuquerque during the taxable years in issue was $2,850 per month; this estimate was based on market rent comparables for QuickPen Computer ranging between $2,200 and $3,500 per month.  Under the valuation engineer's methodology, the fair market rental value for QuickPen Computer was $3,091.67 per month.  The amounts petitioner paid for QuickPen Computer ranged from $2,715 to $3,422 per month during the years in issue.  On this record, we conclude that petitioner has met its burden of proving that the $2,715 to $3,422 per month it paid to shareholder Bryan Yearout to sublease QuickPen Computer was within the range of fair market rental value and was arm's length.  The deficiency determined with respect to this item is therefore not sustained.

III.  Conclusion

Petitioner had valid business reasons for entering into specialized rental agreements with its shareholders to secure needed construction equipment.  We find on this record that the rates petitioner agreed to pay its shareholders for the equipment were reasonable at the time the contracts were entered into and

reflected arm's-length arrangements.  We therefore conclude that petitioner's rental expense deductions claimed during the years in issue are allowed under section 162(a)(3).

We have considered all the remaining arguments made by the parties for results contrary to those reached herein.  To the extent not discussed herein, we conclude those arguments are moot, without merit, or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.

APPENDIX A – RENTAL PAYMENT ANALYSIS

| Item of Equipment | In Service Date | Lease Date | Allowable Annual Rent per Deficiency Notice[1] | Annual Rent Using Hourly/ Monthly 3d-Party Rental Rates[2] | Annual 5-yr Leasehold Interest Value(R's Expert) | Annual Rent for Full-Time Use per P's Contracts[3] | Amounts Paid Share-holders 1988 | Amounts Paid Share-holders 1989 | Amounts Paid Share-holders 1990 | Amounts Paid Share-holders 1991 | Amounts Paid Share-holders 1992 | Amounts Paid Share-holders 1993 | Amounts Paid Share-holders 1995 | Amounts Paid Share-holders 1996 | Amounts Paid Share-holders 1997 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ITEMS RENTED HOURLY** | | | | | | | | | | | | | | | |
| Crane | Apr-93 | Apr-93 | $24,000 | $42,000 | $12,000 | $145,600 | XXX | XXX | XXX | XXX | XXX | $28,359 | $35,086 | $24,251 | $25,565 |
| Backhoe 1 | Jun-86 | Jun-91 | 17,668 | 34,800 | 3,600 | 41,600 | $29,327 | $7,190 | $11,290 | $3,900 | $8,200 | 19,751 | 31,225 | 22,031 | 24,766 |
| Backhoe 2 | Apr-88 | Apr-93 | 15,240 | 34,800 | 3,600 | 41,600 | 9,820 | 11,110 | 10,545 | 12,050 | 8,300 | 19,354 | 24,283 | 25,813 | 30,774 |
| Manlift 1N | Apr-94 | Apr-94 | 3,714 | 7,500 | 960 | 13,000 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 9,677 | 12,675 |
| Manlift 1 | Jun-87 | Jun-92 | 5,211 | 7,500 | 3,100 | 13,000 | 12,390 | 10,500 | 7,250 | 12,250 | 11,210 | 12,439 | 12,474 | 9,614 | 12,675 |
| Manlift 2 | Jul-94 | Jul-94 | 3,714 | 7,500 | 3,120 | 13,000 | 9,300 | 10,500 | 8,510 | 12,500 | 11,500 | 12,110 | 11,581 | 12,673 | 11,675 |
| Manlift 3 | May-88 | May-93 | 6,457 | 12,960 | 1,020 | 15,600 | 8,730 | 12,450 | 13,405 | 14,100 | 13,200 | 14,390 | 16,507 | 15,204 | 12,674 |
| Manlift 4 | Jul-88 | Jul-93 | 6,631 | 12,960 | 1,080 | 15,600 | 5,100 | 12,900 | 7,901 | 15,600 | 15,500 | 16,437 | 12,698 | 15,204 | 13,311 |
| Manlift 5 | Aug-92 | Aug-92 | 12,509 | 16,800 | 6,000 | 23,400 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 19,053 | 13,254 |
| Manlift 6[4] | May-95 | Aug-92 | 3,790 | 8,400 | 2,940 | 13,000 | XXX | XXX | XXX | XXX | XXX | XXX | 6,353 | 9,192 | 12,497 |
| Manlift 7 | May-95 | Aug-95 | 3,790 | 8,400 | 2,940 | 13,000 | XXX | XXX | XXX | XXX | XXX | XXX | 4,235 | 11,185 | 12,375 |
| Boomlift 6 | Aug-92 | Aug-92 | 7,967 | 28,800 | 4,800 | 31,200 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 23,783 | 13,063 |
| Bobcat 943 | Apr-88 | May-88 | 8,739 | 28,800 | 1,320 | 41,600 | 10,605 | 9,971 | 2,130 | 10,540 | 8,940 | 8,691 | 10,190 | 28,320 | 15,500 |
| Bobcat 743 | Oct-94 | Oct-94 | 8,550 | 18,000 | 5,820 | 31,200 | XXX | XXX | XXX | XXX | XXX | XXX | 8,405 | 7,245 | 6,705 |
| Cybermation | Dec-86 | Dec-96 | 22,925 | 42,000 | 3,000 | 210,400 | 21,938 | 35,999 | 21,565 | 24,961 | 33,288 | 71,151 | 83,383 | 104,698 | 153,420 |
| **ITEMS RENTED MONTHLY** | | | | | | | | | | | | | | | |
| Brake Press | Dec-94 | Dec-94 | $43,253 | $78,000 | $15,600 | $44,232 | XXX | XXX | XXX | XXX | XXX | XXX | $46,800 | $46,800 | $36,857 |
| Clean Room | Sep-95 | Sep-95 | 21,000 | 36,000 | 7,800 | 31,200 | XXX | XXX | XXX | XXX | XXX | XXX | 7,800 | 31,200 | 30,559 |
| Lift 1 | Jun-93 | Jun-93 | 1,587 | 7,200 | 1,080 | 6,300 | XXX | XXX | XXX | XXX | XXX | $5,555 | 5,321 | 9,450 | 6,825 |
| Lift 2 | Jun-93 | Jun-93 | 1,587 | 7,200 | 1,080 | 6,300 | XXX | XXX | XXX | XXX | XXX | 3,333 | 5,775 | 9,450 | 6,825 |
| Lift 3 | Mar-95 | Mar-95 | 1,254 | 7,200 | 840 | 6,300 | XXX | XXX | XXX | XXX | XXX | XXX | 4,439 | 9,450 | 6,825 |
| Forklift | Jul-95 | Jul-95 | 18,561 | 28,200 | 10,200 | 25,200 | XXX | XXX | XXX | XXX | XXX | XXX | 12,600 | 50,275 | 31,250 |
| Fusion Mach | Apr-96 | Apr-96 | 8,124 | 28,800 | 4,200 | 22,800 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 17,100 | 22,800 |
| **ITEMS SUBLEASED** | | | | | | | | | | | | | | | |
| LVD Shear | Feb-96 | Feb-96 | $17,640 | $54,000 | $6,000 | $19,200 | XXX | XXX | XXX | XXX | XXX | XXX | XXX | $19,200 | $16,000 |
| QuickPen | May-96 | May-96 | 31,800 | 34,200 | 28,560 | variable | XXX | XXX | XXX | XXX | XXX | XXX | XXX | 20,394 | 41,062 |

NOTE:  Amounts in the "annual rent using monthly third-party rates", "annual 5-yr leasehold interest value", and "annual rent for full-time use per P's contracts" columns are exclusive of State sales tax.  The "amounts paid shareholders" columns (by year) are taken directly from schedules of rate analysis by shareholder prepared by respondent during examination, are by calendar rather than fiscal year, and are inclusive of State sales tax.

[1]This column is based on the putative methodology that respondent used to compute the maximum allowable rents in the notice of deficiency, i.e., maximum allowable rent was computed by taking the appropriate return on equity (30 percent for equipment owned by shareholders Kim and Bryan Yearout; 35 percent for equipment owned by shareholder Kevin Yearout) times the shareholder's investment in the item of equipment.

[2]This rent is computed using the lowest hourly or monthly (depending on the term in petitioner's agreements) rental rate estimated by respondent's expert, when available; otherwise using the rates estimated by petitioner's expert.

[3]Full-time use rent is computed for the most part using the actual rates specified in petitioner's contracts, multiplied by 12 for items of equipment rented on a monthly basis, and by 2,080 for those items rented on an hourly basis.  For Brake Press, the figure reflects the actual monthly rate paid of $3,686 per month multiplied by 12.  For Cybermation Machine, the value is the sum of the monthly rental fee of $200 times 12, and the hourly rental fee of $100 times 2,080.  Where written agreements do not exist, the rent interval and rate were inferred from petitioner's annual payment schedules by item of equipment.  For QuickPen Computer, the maximum annual full-time rent for 1996 was $20,392 (1 month at $2,715, 5 months at $2,851 and 1 month at $3,422); for 1997, the maximum annual full-time rent was $41,064.

[4]The effective date of the written lease contract in the record for Manlift #6 is Aug. 30, 1992.  However, the schedules prepared by respondent's revenue agent during the examination and the report of respondent's expert all show that Manlift #6 was not acquired until Aug. 30, 1995.  On the weight of the evidence, we conclude there was a typographical error in the written lease agreement as petitioner, in fact, incurred no rental charges with respect to Manlift #6 until calendar year 1995.

APPENDIX B - SUMMARY OF EQUIPMENT RENTAL RATES

| Item of Equipment | Lease Date | Contract Rate | Petitioner's Expert | Respondent's Expert[1] |
|---|---|---|---|---|
| ITEMS LEASED HOURLY | | | | |
| Crane | Apr-93 | $70/hr | $76.50 to $85.50/hr | $85/hr; $3,500/mo |
| Backhoe #1 | Jun-91 | $20/hr | $19.50 to $22.50/hr | $35/hr; $2,900/mo |
| Backhoe #2 | Apr-93 | $20/hr | $19.50 to $22.50/hr | $35/hr; $2,900/mo |
| Manlift #1N | Apr-94 | $6.25/hr | $5.50 to $8.50/hr; $650/mo | $8/hr; $625 to $740/mo |
| Manlift #1 | Jun-92 | $6.25/hr | $5.50 to $8.50/hr; $650/mo | $8/hr; $625 to $740/mo |
| Manlift #2 | Jul-94 | $6.25/hr | $5.50 to $8.50/hr; $650/mo | $8/hr; $625 to $740/mo |
| Manlift #3 | May-93 | $7.50/hr | $8 to $15/hr; $1,550/mo | $10/hr; $960/mo |
| Manlift #4 | Jul-93 | $7.50/hr | $8 to $15/hr; $1,550/mo | $15/hr; $1,080/mo |
| Manlift #5 | Aug-92 | $11.25/hr | $10.50 to $17.50/hr; $1,750/mo | $23.75/hr; $1,400/mo |
| Manlift #6 | Aug-92 | $6.25/hr | $5.50 to $8.50/hr; $650/mo | $6.87/hr; $700/mo |
| Manlift #7 | Aug-95 | $6.25/hr | $5.50 to $8.50/hr; $650/mo | $6.87/hr; $700/mo |
| Boomlift #6 | Aug-92 | $15/hr | $15 to $20.50/hr; $2,050/mo | $25/hr; $2,400/mo |
| Cybermation Machine | Dec-96 | $200/mo + $100/hr | $70 to $80/hr or $7,000/mo | none provided |
| Bobcat #943 | May-88 | $20/hr | $18 to $20/hr | $25/hr; $2,400/mo |
| Bobcat #743 | May-88 | $15/hr | $18 to $20/hr | $16.87/hr; $1,500/mo |
| | | | | |
| ITEMS LEASED MONTHLY | | | | |
| Brake Press | Dec-94 | $3,900/mo[2] | $6,500/mo | none provided |
| Clean Room | Sep-95 | $2,600/mo[3] | $3,000/mo | none provided |
| Lift #1 | Jun-93 | $525/mo | $550/mo | $600 to $660/mo |
| Lift #2 | Jun-93 | $525/mo | $550/mo | $600 to $660/mo |
| Lift #3 | Mar-95 | $525/mo | $550/mo | $600 to $660/mo |
| Forklift | Jul-95 | $2,100/mo | $2,200/mo | $2,350/mo |
| Fusion Machine | Apr-96 | $1,900/mo | $2,400/mo | none provided |
| | | | | |
| ITEMS SUBLEASED | | | | |
| LVD Shear | Feb-96 | $1,600/mo | $4,500/mo | none provided |
| QuickPen Computer | Jun-96 | $2,715-$3,422/mo[4] | $2,850/mo | none provided |

[1]The hourly rates for Manlift #3, Manlift #4, Manlift #5, Manlift #6, Manlift #7, Bobcat #943, and Bobcat #743 were computed by dividing the daily fair market rental rate provided by respondent's expert by 8.

[2]Petitioner's annual payment schedules by item of equipment indicate that the monthly rental rate for Brake Press was $3,686/mo, even though the parties' written lease agreement specifies a monthly rental rate of $3,900/mo.

[3]In December 1996, the parties entered a new written lease agreement increasing the monthly rental rate for Clean Room to $3,900/mo.  Petitioner's annual payment schedules by item of equipment indicate that this rate was never implemented.

[4]The parties' written lease agreement specifies a monthly rental rate of $2,715/mo for QuickPen Computer. Petitioner's annual payment schedules by item of equipment indicate that in July 1996 the monthly rental rate increased to $2,851/mo, and in December 1996 the monthly rental rate increased to $3,422/mo.