**TRANSAMERICA CORPORATION,**
**Plaintiff–Appellant,**

v.

**The UNITED STATES,**
**Defendant–Appellee.**

No. 89–1428.

United States Court of Appeals,
Federal Circuit.

May 8, 1990.

Cameron W. Wolfe, Jr. of Orrick, Herrington & Sutcliffe, San Francisco, Cal., argued for plaintiff-appellant. Of counsel were Robert J. Favole and Ruth L. Robinson.

Jonathan S. Cohen, of the Dept. of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Calvin C. Curtis.

David Cohen of Cohen & Fthenakis, Palo Alto, Cal., was on the brief for amicus curiae The Nat. Center for Film and Video Preservation.

NIES, Circuit Judge, SKELTON, Senior Circuit Judge, BISSELL,* Circuit Judge.

NIES, Circuit Judge.

Transamerica Corporation (taxpayer) appeals from the judgment of the United States Claims Court, 15 Cl.Ct. 420 (1988), (Harkins, Sr. J.) affirming the disallowance of taxpayer's claim for a charitable contribution deduction under 26 U.S.C. § 170(a)(1) (1982) in the amount of $10,045,-480 for the taxable year ending December, 1969, by reason of the transfer of certain rights in motion picture film stock to the Library of Congress. We affirm.

I

In a lengthy analysis, the Claims Court detailed the facts with respect to the unusual nature of motion picture film stock which is the subject of the asserted "charitable contribution," as well as the events leading up to the transfer of certain rights therein to the Library of Congress. Familiarity with that opinion is presumed. *See Transamerica Corporation v. United States*, 15 Cl.Ct. 420, 443–475 (1988). Taxpayer's involvement in the charitable contributions issue, which was only part of the proceedings below, stems from its ownership in 1969 of United Artists Corporation. For convenience we refer to both entities as "taxpayer".

The physical property which is the subject matter of the transfer consists primarily of original film negatives of motion pictures on nitrate-base film. Nitrate-base film negatives are not directly "viewable." *Id.* at 444–446. Such film is unusable except to strike a positive therefrom. A master negative can be made on safety film from that positive, which is then used to make duplicate negatives. These materials are generally called "preprint" materials. An exhibition "print", which is a viewable

* Judge Bissell, who died on February 4, 1990, did not participate in the consideration or decision of this case.

film, may be made from a duplicate negative. The trial court characterized the unusual nature of nitrate-base film as follows: "Nitrate-base film is highly flammable, potentially explosive, and, with the passage of time, decomposes. Ultimately nitrate-base film self-destructs and ceases to exist." *Id.* at 469. To prevent eventual loss of the images (and sound) on such film, the court noted that they must be transferred to safety film or preserved in some other manner. *Id.* In 1969, at the time of the transfer, there was no charitable institution, archive, or museum that had vault facilities or resources adequate to store taxpayer's collection of nitrate-base film. *Id.* Taxpayer sought to give them to the University of Wisconsin, which had established a Center of Film and Theater Research, and was apprised that the University could not accept nitrate film, although it accepted a substantial gift of studio memorabilia and documents, as well as safety films, from taxpayer. The Library of Congress, on the other hand, in cooperation with the American Film Institute, has solicited motion pictures on nitrate film from which preservation masters can be made as part of its program to preserve early motion pictures as an historical and scholarly heritage. To build up its collections (whether loaned or by a transfer of ownership), the Library obligated itself to make preservation masters from nitrate negatives. 15 Cl.Ct. at 470.

By a document entitled "Instrument of Gift," taxpayer conveyed "title in and set[ ] over" a large number of nitrate-base motion picture films to the United States for inclusion in the collections of the Library of Congress. The "gift" was stated to be of the "physical property ... only," and "except for the gift herein made, the Donor reserves all right, title, and interest in and to all the property constituting the Collection." With respect to use, the donor permitted the Library to convert the nitrate film to safety film which would become the "physical property" of the Library. The Library agreed that, except for access by taxpayer and the University, use of all original and converted films would be "limited to private study on the Library's prem-

ises by researchers engaged in serious research." No reproductions were allowed; nor was screening for the general public permitted.

The trial court analyzed the "gift" document as follows:

In structure, the Library agreement was more than a simple instrument of gift. It involved reciprocal undertakings. The agreement authorized the Library to convert the image and sound recorded on nitrate-base film onto safety stock to make preservation preprint material and prints, which preservation preprint material and prints would become the physical property of the Library. [Taxpayer's] reservation of commercial exploitation, reproduction, and other intangible rights applied to the use of the safety stock preprint material and preservation prints that the Library converted from the nitrate negatives. Upon physical delivery of the nitrate film, the Library was obliged to store, care for and maintain the property at its sole expense. [Taxpayer] reserved, and the University [of Wisconsin] was given, the right of access on demand to have the Library process orders for positive safety prints to be made from either the nitrate negatives or from the Library's preservation safety preprint materials. With [taxpayer's] prior written consent, the Library could trade [sic, "transfer possession of"] a limited number of the components of the collection to other institutions in exchange for other motion picture materials, but only if the other archive agreed in writing to assume all the terms and conditions imposed on the Library.

The access provisions [for taxpayer] incorporated in the Library agreement were negotiated at [taxpayer's] request and were as broad as any ever extended by the Library. During trial, Library officials explained that [taxpayer's] right of access was the "price" the Library had to pay for the rights it obtained in the Library Property, and that the concessions made to [taxpayer] during the negotiations were part of the "give and

take" between the parties and a "trade-off" of rights and obligations.

*Id.* at 469–70.

The cost of the conversion to safety film which the Library undertook to make was well over $1 million. 15 Cl.Ct. at 471. Taxpayer contributed nothing towards this cost, although it received the right, to the exclusion of other members of the public, to obtain access to the Library's safety film for commercial purposes in perpetuity. Even after the relinquishment of copyright, the Library agreed to make such materials available only to educational institutions for scholarly research and then only with taxpayer's consent.

The Claims Court found that there was no market at the time of the transfer in which taxpayer could have sold its nitrate negatives, stripped of all intangible rights in the motion picture, for scholarly or archival uses or as historical artifacts. Per the Claims Court, the nitrate films as physical property had no fair market value in November, 1969. 15 Cl.Ct. at 475. It specifically rejected taxpayer's analogies of the nitrate film to unique property which could be commercially evaluated as a collector's item (property such as that gifted to the University).

The Claims Court relied on the principle that when a donation is made with the expectation of receiving a substantial benefit in return, no charitable contribution has been made within the meaning of section 170(a). *Ottawa Silica Co. v. United States,* 699 F.2d 1124, 1132 (Fed.Cir.1983); *Singer Co. v. United States,* 449 F.2d 413, 423, 196 Ct.Cl. 90 (1971). In applying that principle to the facts here, the court stated:

> In the transfer of the Library property, the benefit received by the Library was the right to make preservation copies of the nitrate negatives. This benefit brought with it substantial expense to the Library for care and maintenance, and in the costs of copying. The benefits received by [taxpayer] were (1) continued access for its commercial interests to both the physical property in the nitrate negatives given and access to the Library's preservation copies, [and] (2) re-

lief from the costs and potential liability for the storage, maintenance, and care of nitrate negatives. Benefits to [taxpayer] were substantial, and were sufficient to provide [taxpayer] with a *quid pro quo* for the transfer. These benefits to [taxpayer], accordingly, effectively destroyed the charitable nature of the transfer.

15 Cl.Ct. at 475. For reasons which follow, we agree that taxpayer has not established reversible error in the disallowance of the claimed deduction.

## II

The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Thus, the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7 (Fed. Cir.1990). Even after that burden is satisfied, taxpayer must satisfy the ultimate burden of proof. *Id.* at 8.

Under section 170(a)(1) of the Internal Revenue Code, 26 U.S.C. § 170(a)(1), a deduction from gross income is allowable for any "charitable contribution," payment of which is made within the taxable year. That phrase is defined, *inter alia,* in section 170(c)(1) as "a contribution or gift to or for the use of ... the United States ... but only if the contribution or gift is made for exclusively public purposes."

■ Not every transfer of property to the United States or to a charitable institution which is denominated a charitable contribution or gift falls within the ambit of the section. "A payment of money [or transfer of property] generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." *United States v. American Bar Endowment,* 477 U.S. 105, 116–17, 106 S.Ct. 2426, 2432–33, 91 L.Ed.2d 89 (1986). To the same effect is *Hernandez v. Commissioner,* —— U.S. ——, 109 S.Ct. 2136, 2144, 104 L.Ed.2d 766 (1989) (payment to church for special religious evaluation and

education sessions not charitable contribution). *See also* S.Rep. No. 1622, 83d Cong., 2d Sess., 196 (1954); H.R.Rep. No. 1337, 83d Cong., 2d Sess., 44 (1954), *reprinted in* 1954 U.S.Code Cong. & Admin.News 4017, 4180, 4831).

Taxpayer recognizes the above rule but argues that it is only one of two methods for determining the presence of a charitable contribution. Per taxpayer, under the second method, which it argues is applicable here, any anticipated substantial benefit to the donor is not fatal to the deduction so long as such benefit is of less value than the benefit to the donee. Thus, it is taxpayer's position that the Claims Court erred in holding there was no charitable deduction because the court did not determine the comparable dollar values for the respective benefits each party received.

■ Contrary to taxpayer's argument, we understand the cited precedent to set forth a single *general rule* that a purported gift is at least presumptively negated by the receipt of a substantial benefit in return. The benefits each party received need not be quantified and compared to place the transaction within the general rule stated in *American Bar Endowment.* Such comparison is, as an initial matter, not necessary. *Cf. Hernandez v. Commissioner*, 109 S.Ct. 2136; *Ottawa Silica Co.*, 699 F.2d at 1132; *Singer Co.*, 449 F.2d at 422–23. Where in return for a transfer, a taxpayer receives something patently of more than nominal value from the transferee (whether economic or other), a benefit which other members of the public do not receive, a presumption arises that the transfer from taxpayer to the government or charity was not a gift or at least not a gift in its entirety. An identifiable benefit presumptively provides a *quid pro quo* for the transfer. Where a transaction has an "inherently reciprocal nature" when looked at in its entirety, there is no debate that the entire value of the donor's property which was transferred may not be deducted. *Hernandez v. Commissioner*, 109 S.Ct. at 2145.

■ Taxpayer maintains that it is entitled to deduct the entire value of the ni-

trate film, whatever value is placed on it, because it received nothing more than *de minimis* value in exchange. Per taxpayer, the *quid pro quo* analysis is, thus, inapplicable. It asserts that the only benefit it received was relief from storage and insurance for the nitrate film and that this benefit was negligible. However, the Claims Court found that, as part of the transaction, the Library committed itself to make preservation copies of taxpayer's motion pictures and agreed that taxpayer would have an exclusive right of access to that converted material, as well as access to transferred materials. The finding of the Claims Court with respect to the Library's obligation is not clearly erroneous. Further, we agree with the interpretation that the agreement gave taxpayer the rights of access delineated by the Claims Court. Moreover, the right of access to the converted materials which would be made by the Library was not a "reserved" right, as taxpayer would have it, but one that came into being as a result of the agreement.

Taxpayer also denigrates the value of any access right, asserting that it had little need for access because it had largely converted its collection of nitrate films before transferring them to the Library. However, it is not the frequency of access that is important, but, rather, whether the benefit received from the transferee is "substantial." In the *Singer* case, the court defined "substantial benefits" to mean "benefits greater than those that inure to the general public from transfers for charitable purposes." *Singer Co.*, 449 F.2d at 423. In *Singer*, the taxpayer was allowed no section 170(a) deduction for the discount allowed on sewing machines to schools because of the expectation of receiving increased future sales from students. In *Ottawa Silica*, the taxpayer was allowed no section 170(a) deduction for the transfer of land for a public school site because he received the benefit of increased value to his adjoining property from public roads being built to the site.

Here, the availability to taxpayer of its entire collection as needed, for duplication for commercial exploitation in perpetuity,

together with the exclusion of all others from obtaining copies, even after taxpayer's copyright expired, places taxpayer in a unique position, one far different from the public at large. Moreover, at the same time taxpayer was relieved of the expense of storage. We agree with the Claims Court that the facts here give rise to receipt of a "substantial benefit" by taxpayer in exchange for the benefits received by the Library. Thus, by reason of taxpayer's receipt of such benefit, the presumption arises that a charitable contribution was not made.

## III

A taxpayer may, in certain circumstances, be able to rebut the above presumption at least in part and, thereby, obtain a partial deduction. In *American Bar Endowment*, the Supreme Court recognized that some transfers to a charitable institution admit to division into two parts, one being a payment for a thing of value and the other, a charitable contribution. As stated there:

> A taxpayer may ... claim a deduction for the difference between a payment to a charitable organization and the market value of the benefit received in return, on the theory that the payment has the "dual character" of a purchase and a contribution. See, *e.g.*, Rev.Rul. 67–246, 1967–2 Cum.Bull. 104 (price of ticket to charity ball deductible to extent it exceeds market value of admission); Rev. Rul. 68–432, 1968–2 Cum.Bull. 104, 105 (noting possibility that payment to charitable organization may have "dual character").
>
> In Rev.Rul. 67–246, *supra*, the IRS set up a two-part test for determining when part of a "dual payment" is deductible. First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be "made with the intention of making a gift." 1967–2 Cum.Bull., at 105.

477 U.S. at 117, 106 S.Ct. at 2433. The Court specifically approved that two-part standard. *Id.* at 118, 106 S.Ct. at 2433–34.

Taxpayer argues, if this court believes the transfer here has a "dual character," we need only subtract the cost of storage of the nitrate films from taxpayer's evaluation of the nitrate films to arrive at the net amount of the charitable contribution. However, for reasons previously indicated, taxpayer's view as to the benefit it received is too restrictive. Taxpayer did not "purchase" storage facilities for the nitrate film, as one might purchase the dinner portion of a fund-raising affair. While relief from storage costs was a benefit, that was not the entirety of the benefit taxpayer received. In addition, taxpayer was given the right of exclusive access to a permanent collection of preserved films which the Library would maintain at its expense and which only taxpayer could commercially exploit or even freely view. Thus, taxpayer's proposed mathematical equation in which only storage costs are deducted is inherently defective. Moreover, taxpayer put in no evidence here as to what its exclusive right of access was worth. Taxpayer simply refused and continues to refuse to acknowledge that access was part of the *quid pro quo*.

Having failed to prove the value of its own benefit in the equation, taxpayer's arguments concerning the error of the Claims Court in evaluating the benefit received by the Library need not be addressed. We would note only that we do not read the Claims Court's opinion as saying, as taxpayer asserts, that the rights received by the Library had no value. The court found that bare legal title to the nitrate films *with no other rights* had no value.

In view of the above, taxpayer's assertion that the Claims Court erred by failing to determine a net amount of the deduction on the basis of the evidence it proffered is untenable. No reversible error has been shown. The first requirement of the "dual character" test simply was not met. Accordingly, we need not address the arguments of taxpayer that it had the requisite intent and, therefore, that the second part of the "dual character" test was met.

In sum, because taxpayer received a *quid pro quo* in the form of a substantial

benefit for the transfer of property to the Library, the transaction falls within the general rule that there was no gift. Further, the burden was on taxpayer to establish the facts necessary to receive a partial deduction under the dual character test of *American Bar Endowment.* As in that controlling precedent, taxpayer failed to prove its claim for a partial deduction. *See also, Hernandez v. Commissioner,* 109 S.Ct. at 2146, n. 10.

## IV

We conclude that taxpayer has failed to demonstrate that the Claims Court committed reversible error in upholding the disallowance of a deduction under section 170(a)(1) of the Code for all or part of the subject transfer.

AFFIRMED.