THEODORE R. ROLFS AND JULIA A. GALLAGER, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 9377–04.        Filed November 4, 2010.

In 1998 Ps donated a house to their local volunteer fire department (VFD) to be used for firefighter and police training exercises and eventual demolition. Within several days, the VFD conducted two training exercises at the house and burned it down. Ps claimed a deduction for a charitable contribution of $76,000 on their Federal income tax return for 1998 on account of their donation of the house to the VFD and amended their petition to assert that they are entitled to deduct $235,350, the house's reproduction cost. R contends that Ps are not entitled to any deduction because Ps received, in exchange for the property donated, a substantial benefit in the form of demolition services, the value of which exceeded the value of the property donated (quid pro quo argument). R

determined that Ps are liable for an accuracy-related penalty under sec. 6662(a), I.R.C. and, in his answer, asserted in the alternative an accuracy-related penalty under sec. 6662(h), I.R.C. Ps contend that the Court should not consider R's quid pro quo argument because it is new matter that R raised for the first time on brief. *Held*: R's quid pro quo argument is not new matter and will be considered, as Ps raised the issue in their petition. *Held*, *further*, Ps did not make a charitable contribution within the meaning of sec. 170(c), I.R.C., as a result of their donation of the house because they received a substantial benefit in exchange for the donation and have failed to show that the value of the property donated exceeded the value of the benefit received. *United States v. Am. Bar Endowment*, 477 U.S. 105 (1986), followed. *Held*, *further*, Ps acted with reasonable cause and are accordingly not liable for any accuracy-related penalty under sec. 6662(a) or (h), I.R.C.

*Michael G. Goller*, *Robert E. Dallman*, and *Michelle L. Mukhtar*, for petitioners.
*James E. Schacht* and *Mark J. Miller*, for respondent.

GALE, *Judge*: Respondent determined a deficiency of $19,940 in petitioners' Federal income tax for 1998 and an accuracy-related penalty equal to 20 percent of the underpayment under section 6662(a).[1] By their amended petition, petitioners aver that they are entitled to a charitable contribution deduction of $235,350, rather than the $76,000 claimed on their return, as a result of a donation of a house to a local volunteer fire department, resulting in an overpayment of $39,672 for 1998. By answer to the amended petition, respondent asserts that petitioners are liable for a penalty under section 6662(h) for a gross valuation misstatement. The issues for decision are: (1) Whether petitioners are entitled to a deduction for a charitable contribution under section 170(a) in connection with their donation of a house to a local volunteer fire department for training exercises and demolition and (2) whether petitioners are liable for any accuracy-related penalty under section 6662.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and attached exhibits are incorporated in our findings

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

by this reference. Theodore R. Rolfs and Julia A. Gallagher (hereafter, petitioners, and Theodore R. Rolfs alone, petitioner) were married during the taxable year 1998 and filed a joint Federal income tax return for that year. Petitioners resided in Wisconsin at the time the petition was filed.

## *The Lake Property*

On November 27, 1996, petitioners paid $600,000 for a fee simple interest in a 3-acre lakefront property at 5892 Oakland Road in the Village of Chenequa, Wisconsin (lake property). The lake property was on Pine Lake in an area known locally as "lake country"—a desirable residential area where lakefront houses have historically commanded premium prices. The lake property was accessed by a private road owned by an association, the members of which were the homeowners living on the road.

At the time of purchase there were several improvements on the lake property including a house (lake house), a detached garage, a boathouse, and a well and septic system. The lake house, originally built in approximately 1900, was a 1½-story structure with 3,138 square feet of living space, including a stone facade addition that was constructed in the 1950s. The lake house was in good condition and habitable, though in need of remodeling in petitioner's view.

For 1998 the Village of Chenequa, Waukesha County, Wisconsin, assessed the lake property at $460,100, allocating $323,000 to the land and $137,100 to the improvements, for local property tax purposes.

After acquiring the lake house, petitioners were initially undecided regarding whether to remodel it or tear it down. Their deliberations were resolved when petitioner Julia A. Gallagher's mother, Beatrice Gallagher (Mrs. Gallagher), suggested in late 1997 that petitioners demolish the lake house, build a new house to her specifications as her residence in its place, and then exchange the lake property for her existing residence. Petitioners agreed to Mrs. Gallagher's proposal, and they carried out the plan as described below.

Petitioners had a cordial relationship with Mrs. Gallagher during the periods relevant to this case.

*Demolition of the Lake House*

Sometime in the latter part of 1997 petitioner determined that it would cost $10,000 to $15,000 to demolish the lake house and remove the debris. Around the same time, petitioner learned from his brother of an individual who had claimed a charitable contribution deduction for donating a residence to a local fire department to be burned down. Petitioner decided to donate the lake house to the Village of Chenequa Volunteer Fire Department (VFD) for firefighter training exercises and demolition in a controlled burn and to claim a charitable contribution deduction for the value of the lake house.

In early October 1997 petitioner obtained the necessary approval for the burn from the Wisconsin Department of Natural Resources (DNR), subject to petitioner's notifying the DNR of the actual date of the burn.

On February 10, 1998, petitioner sent a letter to Gary Wieczorek, the chief of the VFD and of the Chenequa Police Department (Chief Wieczorek), which stated:

As we have discussed, I would like to donate our house located at 5192[2] Oakland Road in the Village of Chenequa to the Fire and Police departments of the Village for training and eventually demolition. This letter shall serve as an acknowledgment that it is my intention to donate the house for such purposes. The house is available immediately. If any further approvals are needed please contact me.

Chief Wieczorek understood that petitioners donated the lake house to the Village of Chenequa for the limited purpose of using the structure for training exercises of firefighters and police, and with the ultimate aim of having the VFD burn it down. He also understood that petitioners expected that the lake house would be destroyed within "the first part of that year [1998]". Chief Wieczorek further understood that the VFD could not use the lake house for any other purpose than training exercises that would include its destruction by fire.

Sometime shortly before February 18, 1998, the Chenequa Police Department used the lake house for a training exercise. On February 18, 1998, the VFD conducted an initial training exercise at the lake house. On February 21, 1998, 11

--------

[2] The letter contains a typographical error in that the correct address of the lake property is 5892 Oakland Road.

days after petitioner's letter donating the lake house, the VFD conducted a second training exercise and burned the structure to the ground.

The firefighter training exercises at the lake house allowed the VFD to satisfy monthly training requirements imposed under Wisconsin State law. Chief Wieczorek believed the firefighter training exercises conducted at the lake house were superior to the training exercises otherwise available to the VFD.

On April 1, 1998, Chief Wieczorek sent a letter to petitioner which stated:

This letter is in receipt of your donation to the Village of Chenequa and its Fire Department in the amount of $1,000, check #4820 and the donation of the use of your home at 5892 Oakland Road for training purposes. The home at 5892 Oakland Road was used during the month of February for training by the Critical Incident Team and the Police Department and for further training by the Fire Department in roof ventilation and smoke drills. On February 21, 1998, the home was destroyed at a practice fire with our mutual aid fire departments in which we practiced using water supply in a non-hydranted area.

Chief Wieczorek solicited the $1,000 payment from petitioners (referred to in the letter quoted above) to defray the costs that the Village of Chenequa otherwise would incur in connection with the training exercises the VFD conducted at the lake house.

On March 30, 1998, approximately 5 weeks after the destruction of the lake house, petitioners entered into a contract to have a new residence constructed on the lake property at a cost of approximately $383,000. The construction contract did not itemize the costs of construction.

*Petitioners' 1998 Income Tax Return*

Petitioners timely filed a joint Federal income tax return for the taxable year 1998. Petitioners attached to the return a Form 8283, Noncash Charitable Contributions, reporting that the lake house had a cost or adjusted basis of $100,000, and that the lake house was appraised at a fair market value of $76,000. The Form 8283 included a "Declaration of Appraiser" signed by Richard S. Larkin and a "Donee Acknowledgment" signed by Chief Wieczorek. Petitioners claimed on Schedule A, Itemized Deductions, a deduction of $12,626 attributable to charitable contributions by cash or

check[3] and a deduction of $83,632 attributable to charitable contributions other than by cash or check (which included a $76,000 deduction claimed for the donation of the lake house). Petitioners attached to the return a summary appraisal report prepared by Richard S. Larkin of Larkin Appraisals, Inc., dated December 31, 1997, in support of the charitable contribution deduction claimed with respect to the lake house.

*Respondent's Examination and the Notice of Deficiency*

For their 1998 taxable year petitioners retained all documentation that a taxpayer exercising ordinary care and prudence in claiming a charitable contribution deduction would normally keep, and they maintained all records required under the Internal Revenue Code. The parties have stipulated that petitioners cooperated timely with all of respondent's requests for witnesses, information, documents, meetings, and interviews during the examination of their 1998 return. During the examination, respondent did not request access to the lake property.

Respondent issued to petitioners a notice of deficiency for 1998 disallowing the charitable contribution deduction of $76,000 claimed with respect to the donation of the lake house. The notice of deficiency stated in pertinent part:

On Schedule A, line 18 of your return for the year ended December 31, 1998, you claimed an itemized deduction of $96,258.00 for Gifts to Charity. It has not been established that any amount more than $7,632.00 qualifies for deduction under any section of the Internal Revenue Code. Therefore, your taxable income for the year ended December 31, 1998 is increased by $76,000.

A schedule of examination adjustments attached to the notice of deficiency shows that respondent actually determined that petitioners were entitled to a deduction for charitable contributions totaling $20,258 for 1998 (rather than the $7,632 referred to in the statement quoted above).

---

[3] The record does not include an itemization of this amount, and it is unclear whether petitioners claimed a deduction for the $1,000 remitted to the Village of Chenequa Volunteer Fire Department (VFD) to defray the costs incurred in connection with the use of the lake house for training exercises.

*The Pleadings*

Petitioners filed a timely petition for redetermination alleging that they were entitled to a charitable contribution deduction of $76,000 related to their donation of the lake house. Petitioners subsequently filed an amended petition in which they averred that they were entitled to a charitable contribution deduction for their donation of the lake house of at least $235,350, the reproduction cost of the house, resulting in an overpayment of their 1998 tax liability by $39,672. Respondent filed an answer to amended petition denying the averments summarized above and asserting that, as an alternative to the determination in the notice of deficiency, petitioners were liable for a penalty for a gross valuation misstatement equal to 40 percent of the underpayment under section 6662(h).

*Pretrial Proceedings*

As part of the pretrial proceedings, respondent requested permission for his expert witness to visit the lake property. On September 19, 2005, petitioners' counsel informed respondent's counsel that the lake property was then owned by Mrs. Gallagher. That same day, respondent's counsel contacted Mrs. Gallagher and requested that respondent's expert witness be permitted to enter the private road leading to the lake property for the purpose of viewing the site to aid in the preparation of a valuation report. Mrs. Gallagher denied the request. Respondent's counsel informed petitioners' counsel of this development, and petitioners' counsel subsequently informed respondent's counsel that petitioners were unable to arrange for respondent's expert to gain access to the lake property. Respondent never made a request pursuant to Rule 72 for permission to visit the lake property.[4]

*Valuation Experts*

A. *Richard S. Larkin*

Petitioners' expert witness, Richard S. Larkin, is president of Larkin Appraisals, Inc., and he prepared the summary appraisal report attached to petitioners' 1998 return. Mr.

---

[4] Rule 72(a)(2) allows any party to serve on any other party a request to permit entry upon designated land or other property in the possession or control of the other party.

Larkin is a member of the Appraisal Institute, is a Wisconsin certified residential appraiser, and is qualified to give an opinion as to the value of real estate.

In his original report Mr. Larkin used the so-called before and after approach to determine the value of the lake house; that is, treating the fair market value of the lake house as equal to the difference between fair market value of the lake property *with* the lake house and the fair market value of the lake property *without* the lake house. More specifically, Mr. Larkin determined the value of the lake property with all improvements to be $675,000, on the basis of a comparison to the direct sales of comparable properties. He then subtracted from this amount: (i) The value of the land (estimated at $550,000 on the basis of direct sales of comparable vacant land), (ii) the value of the structural improvements other than the lake house (estimated at $29,000 on the basis of their replacement cost less physical depreciation) and (iii) certain site improvements estimated at $20,000. By subtracting the value of the land and improvements other than the lake house (totaling $599,000) from the "direct sales" market value of the lake property with all improvements ($675,000), Mr. Larkin arrived at what he considered the "contributory value" of the lake house: $76,000, as of December 20, 1997.[5] As part of his analysis, Mr. Larkin also estimated that the reproduction cost of the lake house was $235,350.

Mr. Larkin later supplemented his original report to acknowledge that during the period in question there existed in Wisconsin what he considered a submarket in which single-family residences were sold for the purpose of moving them to other locations. Mr. Larkin concluded that this market was not relevant to the valuation exercise he performed with regard to the lake house because the lake house was not going to be moved.

### B. *Robert A. George*

Respondent's expert Robert A. George is a professional "house mover". Mr. George has contracted to move numerous houses throughout Wisconsin, and he is qualified to give an

---

[5] There apparently is no dispute that this valuation would remain the same if the valuation date were changed to Feb. 10, 1998—the date that petitioners donated the lake house to the VFD.

opinion as to the value of houses that are sold for the purpose of moving them to other locations. After considering the height of the lake house and his determination that the lake house could be moved only after removing the stone facade addition to the house and cutting down surrounding mature trees, Mr. George concluded that it would cost approximately $100,000 to move the lake house to another location in the Chenequa area. However, Mr. George concluded that in view of the high cost of land in the Chenequa area in comparison with the modest nature of the lake house, no one would purchase the lake house for the purpose of moving it, as any land close enough to render a move feasible would be too expensive to justify siting the modest lake house there. Mr. George expressed the further opinion that any buyer would pay no more than a nominal "courtesy" amount of $100 to $1,000 for the structure as of February 10, 1998, essentially for the purpose of ensuring that there was sufficient consideration to render the purchase contract binding. Mr. George also opined that any salvage value attributable to the structure (or components within the house) would be offset by the cost of labor to remove those components.

C. *Marcia Solko*

Respondent's expert Marcia Solko is a real estate specialist employed by the Wisconsin Department of Transportation. Her primary responsibilities were to arrange for the clearing or removal of all improvements (including houses) from real estate designated by the State of Wisconsin for highway construction projects. Ms. Solko is qualified to give an opinion as to the value of houses that are sold for the purpose of moving them to other locations.

Taking many factors into account, including the height of the lake house, the stone facade addition, and the fact that the house sat on a concrete slab foundation, Ms. Solko concluded that it would be very costly to attempt to move the lake house, and she doubted that anyone would buy the lake house in order to move it to another property.

OPINION

I. *Charitable Contribution Deductions*

Section 170(a)(1) provides in relevant part that a deduction is allowed for any charitable contribution, payment of which is made within the taxable year. Section 170(c)(1) defines the term "charitable contribution" to include a contribution or gift to or for the use of, inter alia, a political subdivision of a State, but only if the gift is made for exclusively public purposes. [6]

The Supreme Court has defined "contribution or gift" for purposes of section 170 as follows:

> The legislative history of the "contribution or gift" limitation [of section 170], though sparse, reveals that Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services. Only the former were deemed deductible. The House and Senate Reports on the 1954 tax bill, for example, both define "gifts" as payments "made with no expectation of a financial return commensurate with the amount of the gift." * * * [*Hernandez v. Commissioner*, 490 U.S. 680, 690 (1989).]

Thus, "A payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." *United States v. Am. Bar Endowment*, 477 U.S. 105, 116 (1986); see also *Transam. Corp. v. United States*, 902 F.2d 1540, 1543–1546 (Fed. Cir. 1990); *Singer Co. v. United States*, 196 Ct. Cl. 90, 449 F.2d 413 (1971).

The Supreme Court has further instructed that in ascertaining whether a given payment or property transfer was made with the expectation of any return benefit or quid pro quo, we are to examine the external, structural features of the transaction, which obviates the need for imprecise inquiries into the motivations of individual taxpayers. *Hernandez v. Commissioner*, *supra* at 690–691.

If a charitable contribution is made in property other than money, the amount of the contribution is generally the fair market value of the property at the time of the contribution. Sec. 1.170A–1(c)(1), Income Tax Regs. "[F]air market value" for this purpose "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both

---

[6] There is no dispute that the Village of Chenequa (and by extension the VFD) qualifies as a political subdivision of a State within the meaning of sec. 170(c).

having reasonable knowledge of the relevant facts." Sec. 1.170A–1(c)(2), Income Tax Regs. Restrictions on the property's use or marketability on the date of the contribution must be taken into account in the determination of fair market value. See *Cooley v. Commissioner*, 33 T.C. 223, 225 (1959), affd. 238 F.2d 945 (2d Cir. 1960); *Deukmejian v. Commissioner*, T.C. Memo. 1981–24; *Dresser v. Commissioner*, T.C. Memo. 1956–54; see also Rev. Rul. 85–99, 1985–2 C.B. 83.

## II. *The Parties' Arguments*

### A. *Respondent's Position*

Respondent contends that petitioners are not entitled to a deduction for a charitable contribution in connection with their donation of the lake house to the VFD because they anticipated and received a substantial benefit in exchange for the contribution; namely, demolition services. Petitioners therefore did not make a charitable contribution within the meaning of section 170(c), as interpreted in *United States v. Am. Bar Endowment*, *supra*, because the fair market value of the lake house as donated did not exceed the fair market value of the demolition services petitioners received from the VFD in exchange for the donation (quid pro quo argument). Respondent argues in the alternative that (1) the charitable contribution deduction in dispute is disallowed under section 170(f)(3)(A) because petitioners transferred to the VFD less than their entire interest in the lake house; and (2) the lake house as donated to the VFD was worthless.

### B. *Petitioners' Position*

Petitioners first contend that the burden of proof on all issues is shifted to respondent pursuant to section 7491(a). Petitioners assert that the Court should not consider respondent's quid pro quo argument (to the effect that petitioners received a benefit in exchange for their donation) because this argument constitutes new matter that respondent raised for the first time in his opening brief. However, if respondent is allowed to raise the quid pro quo argument, petitioners contend that they donated property with a fair market value of $76,000 (according to a qualified appraisal) which they have shown should be valued at its

reproduction cost of $235,350 and that they received only an "incidental benefit" in return.[7] Petitioners contend that section 170(f)(3)(A) is inapplicable because in transferring the lake house to the VFD with the right to demolish it, they transferred their entire interest in the property.

### III. *Section 7491(a) Shift in the Burden of Proof*

We consider as a preliminary matter petitioners' contention that the burden of proof has shifted to respondent pursuant to section 7491(a).

In general, the Commissioner's determination as set forth in a notice of deficiency is presumed correct. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Rule 142(a)(1) sets forth the general rule that the burden of proof shall be on the taxpayer, except as otherwise provided by statute or determined by the Court, and except that the burden of proof shall be upon the Commissioner in respect of any new matter, increases in deficiency, and affirmative defenses.

Section 7491(a)(1), however, provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if (1) the taxpayer introduces credible evidence with respect to such issue, sec. 7491(a)(1); and (2) the taxpayer satisfies certain other conditions, including substantiation of any item and cooperation with the Government's requests for witnesses and information, sec. 7491(a)(2); see also Rule 142(a)(2).

Petitioners contend that they have satisfied the requirements of section 7491(a) and the burden of proof as to all factual issues affecting the deficiency in their tax should be shifted to respondent. Respondent contends that because he was denied access to the lake property incident to his trial preparation, petitioners have not satisfied the section 7491(a)(2)(B) requirement that they cooperate with "reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews". Specifically, respondent argues, petitioners have failed to show that they took reasonable steps to secure Mrs. Gallagher's permission for respondent's expert witness to view the lake property. Petitioners contend that they had no control over Mrs. Gallagher and that in any event section 7491(a)(2)(B) imposes a

---

[7] A $235,350 deduction would give rise to an overpayment for 1998.

cooperation requirement on taxpayers only during the examination process.

A taxpayer bears the burden of proving that he or she has met the requirements of section 7491(a). See *Richardson v. Commissioner*, T.C. Memo. 2005–143; H. Conf. Rept. 105–599, at 239 (1998), 1998–3 C.B. 747, 993. The legislative history underlying section 7491(a) states in pertinent part:

the taxpayer must cooperate with reasonable requests by the Secretary for meetings, interviews, witnesses, information, and documents (including providing, within a reasonable period of time, access to and inspection of witnesses, information, and documents within the control of the taxpayer, as reasonably requested by the Secretary). Cooperation also includes providing reasonable assistance to the Secretary in obtaining access to and inspection of witnesses, information, or documents not within the control of the taxpayer (including any witnesses, information, or documents located in foreign countries). * * * [H. Conf. Rept. 105–599, *supra* at 240, 1998–3 C.B. at 994.]

We first observe that petitioners' contention that the section 7491(a)(2)(B) requirement of cooperation extends only through the examination of their return is meritless. For purposes of section 7491(a)(2)(B), the requirement of cooperation continues through the pretrial proceedings in the Tax Court. See, e.g., *Connors v. Commissioner*, 277 Fed. Appx. 122 (2d Cir. 2008), affg. T.C. Memo. 2006–239; *Yearout Mech. & Engg., Inc. v. Commissioner*, T.C. Memo. 2008–217; *Krohn v. Commissioner*, T.C. Memo. 2005–145; *Lopez v. Commissioner*, T.C. Memo. 2003–142, affd. on this issue 116 Fed. Appx. 546 (5th Cir. 2004).

We likewise are not persuaded that petitioners have met their burden of proving that they fully cooperated with respondent's reasonable requests during the pretrial phase. The parties stipulated in pertinent part that after respondent's counsel informed petitioners' counsel that Mrs. Gallagher had denied respondent's request for access to the lake property, "Petitioners' counsel subsequently advised Respondent's counsel that no arrangements could be made by the Petitioners to have Respondent's expert witness see the Property." What is lacking in this record is any evidence of what effort, if any, petitioners undertook to assist in securing Mrs. Gallagher's cooperation to permit respondent's expert to visit the lake property. As reflected in the legislative history, Congress intended that the duty of cooperation extend to

"providing reasonable assistance to the Secretary in obtaining access to and inspection of * * * information * * * not within the control of the taxpayer". Petitioners offered no testimony concerning their efforts to obtain Mrs. Gallagher's cooperation, stating only that they had a good relationship with her. Mrs. Gallagher did not testify. [8]

In view of this evidentiary vacuum, petitioners have failed to show what "reasonable assistance" they offered, if any, with respect to respondent's effort to obtain access to information from a person not within petitioners' control. As a result, they have not satisfied the cooperation requirement of section 7491(a)(2)(B). Accordingly, we hold that section 7491(a) is inapplicable. Since the condition of the lake property permeates all factual issues in this case, petitioners retain the burden of proof with respect to all factual issues.

IV. *Analysis*

A. *Respondent's Quid Pro Quo Argument*

1. *Status as New Matter*

We must first decide whether respondent is allowed to raise his quid pro quo argument, premised on *United States v. Am. Bar Endowment*, 477 U.S. 105 (1986), to the effect that petitioners are not entitled to any charitable contribution deduction because the fair market value of the property they donated did not exceed the fair market value of the benefit they received in exchange. Petitioners contend that the issue was untimely raised and therefore its consideration would be prejudicial to them.

We have refused to consider an untimely raised issue when the opposing party is unfairly surprised and prejudiced because his defense against the issue requires the presentation of evidence different from the evidence relevant to the identified issues in the case. See *Leahy v. Commissioner*, 87 T.C. 56, 64–65 (1986); *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708, 733–736 (1981); *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555–557 (1973). However, we are not persuaded that petitioners were unfairly surprised or prejudiced

---

[8] Although petitioners' counsel suggested to the Court that Mrs. Gallagher's previous experience with the Internal Revenue Service occasioned her intransigence in the instant proceeding, counsel's statements do not constitute testimony or evidence. See, e.g., *U.S. Holding Co. v. Commissioner*, 44 T.C. 323, 327 (1965).

by respondent's quid pro quo argument. Starting with the petition and continuing through their opening brief,[9] petitioners have cited *Scharf v. Commissioner*, T.C. Memo. 1973–265, and contended that a "small" or "incidental" benefit received by a donor "does not negate a finding of donative intent". *Scharf* is quintessentially a quid pro quo case, involving facts that are similar to those of the instant case in many respects. *Scharf* involved a charitable contribution deduction claimed for the donation of a building, partially destroyed by fire, to a volunteer fire department to be burned down for training purposes. Recognizing that the taxpayer's receipt of a benefit from the building's demolition necessitated a quid pro quo analysis, this Court observed that the circumstances presented "an exceedingly close question" but upheld the deduction, reasoning that the public benefit of firefighter training greatly exceeded the demolition benefit received by the donor taxpayer.

By virtue of their reliance on *Scharf* from the outset, it is petitioners, not respondent, who first raised the quid pro quo issue. Petitioners cannot claim to have been unfairly surprised when respondent further developed the quid pro quo theory on brief, including analyzing post-*Scharf* developments in the caselaw such as the Supreme Court's decision in *United States v. Am. Bar Endowment*, *supra*. Given petitioners' reliance on *Scharf*, their contention from the outset that the benefit they received was "small" or "incidental", and *Scharf*'s characterization of the issue as a close one, we believe it was incumbent upon petitioners to proffer whatever evidence they had bearing upon the benefit they received from the donation of the lake house; and we conclude that petitioners were not unfairly surprised or prejudiced by respondent's quid pro quo argument.[10] See *Smalley v. Commissioner*, 116 T.C. 450, 456–457 (2001); *Ware v. Commissioner*, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990); *Pagel, Inc. v. Commissioner*, 91 T.C. 200, 211 (1988), affd. 905 F.2d 1190 (8th Cir. 1990). In addition, *Scharf* sustained a charitable contribution deduction for the

---

[9] Petitioners raised their "new matter" objection in their answering brief, arguing that respondent raised the quid pro quo argument for the first time in his opening brief.

[10] Petitioners also contend that if respondent is allowed to raise the quid pro quo argument, he should bear the burden of proof on the issue on account of his untimely raising of it. Because we conclude that petitioners raised the quid pro quo issue in their petition, there are no grounds to shift the burden of proof to respondent.

donation of a building to be burned down by a volunteer fire department, whereas respondent argues that such a deduction is precluded in petitioners' case under *Am. Bar Endowment*. Since petitioners contend that *Scharf* supports a decision in their favor, it is appropriate and important to consider the application of a quid pro quo analysis in this case. We shall therefore consider the issue.

### 2. *Development of the Quid Pro Quo Test*

Respondent argues that petitioners are not entitled to a charitable contribution deduction for their donation of the lake house because they anticipated and received a substantial benefit in exchange for the donation; namely, the demolition of the lake house on a site where they intended to rebuild. Respondent contends that the value of the demolition services received exceeded the value of the property petitioners transferred, eliminating any charitable intent from the transaction. As noted, respondent relies on *United States v. Am. Bar Endowment*, *supra*, and on section 1.170A–1(h)(1), Income Tax Regs.

In *United States v. Am. Bar Endowment*, *supra* at 116, the Supreme Court set forth the principle that a payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return. "The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration." *Id.* at 118. However, the Court also recognized that a taxpayer's payment to a charitable organization that is accompanied by his receipt of a benefit may have a "'dual character' of a purchase and a contribution" if the payment exceeds the value of the benefit received in return. *Id.* at 117. The Court consequently adopted a two-part test (first articulated in Rev. Rul. 67–246, 1967–2 C.B. 104) for determining when part of a dual payment is deductible. "First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be made with the intention of making a gift." *Id.* (internal quotations omitted). The *Am. Bar Endowment* test has since been incorporated into the regulations. See sec. 1.170A–1(h), Income Tax Regs.;[11] T.D. 8690, 1997–1 C.B. 68. The test also

---

[11] Sec. 1.170A–1(h)(1), Income Tax Regs., states:

applies where payment is made in property other than money. See *Transam. Corp. v. United States*, 902 F.2d at 1543–1546.

Petitioner had decided to demolish the lake house and construct another residence on the site when he contacted the VFD about donating the lake house to be burned down for training purposes. Consequently, examining the external features of the transaction, as we must, see *Hernandez v. Commissioner*, 490 U.S. at 690–691, we find that petitioner anticipated a benefit in exchange for the contribution: demolition of the lake house. On similar facts, this Court decided in a Memorandum Opinion, *Scharf v. Commissioner*, T.C. Memo. 1973–265, that the taxpayer was entitled to a charitable contribution deduction for the donation of a structure, equal to its value for insurance purposes. We reasoned in *Scharf* as follows:

> we conclude * * * that the benefit flowing back to petitioner, consisting of clearer land, was far less than the greater benefit flowing to the volunteer fire department's training and equipment testing operations. * * * We think the petitioner benefited only incidentally from the demolition of the building and that the community was primarily benefited in its fire control and prevention operations. Consequently, on balance, we hold that the petitioner is entitled to a charitable contribution deduction.

The test applied in *Scharf*, which examines whether *the value of the public benefit* of the donation exceeded the value of the benefit received by the donor, differs from the Supreme Court's test announced 13 years later in *United States v. Am. Bar Endowment*, 477 U.S. 105 (1986). The *Am. Bar Endowment* test examines whether the *fair market value of the contributed property* exceeded the fair market value of the benefit received by the donor. The test applied in *Scharf* has no vitality after *Am. Bar Endowment*.[12] Instead, we

---

No part of a payment that a taxpayer makes to or for the use of an organization described in section 170(c) that is in consideration for * * * goods or services * * * is a contribution or gift within the meaning of section 170(c) unless the taxpayer—

 (i) Intends to make a payment in an amount that exceeds the fair market value of the goods or services; and

 (ii) Makes a payment in an amount that exceeds the fair market value of the goods and services.

 [12] We note also that the entirely voluntary nature of petitioners' decision to demolish the lake house distinguishes their case from *Scharf v. Commissioner*, T.C. Memo. 1973–265. Mr. Scharf's building had been partially destroyed by fire and was about to be condemned as unsafe when he decided to donate it to the local fire department for demolition in a training fire. Con-

Continued

must consider whether the value of the lake house as donated exceeded the value of the demolition services petitioners received. [13]

### 3. *Application of the Quid Pro Quo Test*

### a. *Value of the Benefit Received*

Petitioner testified that his investigation revealed that it would cost approximately $10,000 to $15,000 to have the lake house demolished and the debris removed. This estimate is consistent with those of both of respondent's experts, who put the figure at approximately $10,000 to $12,000 (Ms. Solko) and $10,000 (Mr. George).

Petitioners nonetheless dispute the conclusion that they saved demolition costs of at least $10,000 by virtue of their donation of the lake house to the VFD. Petitioner claimed in his testimony that the cost of the contract to construct the new house for Mrs. Gallagher included "$10,000 to $15,000" in excavation charges for clearing the remnants of the burn and the concrete foundation of the lake house. Petitioners argue on brief that these additional excavation costs demonstrate that petitioners did not save anything from the demolition resulting from the burning and therefore received no benefit from their donation of the lake house to the VFD.

We reject this contention. First, the documentary evidence tends to undermine the claim that the construction contract for the new residence included $10,000 or more for excavation charges associated with clearing the remnants of the burn. The construction contract for the new house, as included in the record, does not contain any allocation of the total contract price for any specific cost—excavation, debris removal, or otherwise. Moreover, a preprinted portion of the contract covering "Building Site Conditions" has been lined through by the parties to the contract, creating an inference that the contract price did *not* cover any significant debris or foundation removal services. Second, two experts, plus

sequently, *Scharf*'s use of the "insurance loss" value (less insurance proceeds received) to measure the value of the structure donated offers no basis for valuing the structure here, where no precontribution casualty was involved.

[13] Because, as discussed *infra*, we conclude that the value of the lake house did not exceed the value of the demolition services, we need not address the second prong of the test set forth in *United States v. Am. Bar Endowment*, 477 U.S. 105 (1986): whether the excess of the value of the donation over the value of the benefit received was transferred with the intention of making a gift.

whomever petitioner consulted, estimated the cost of demolition *and* debris removal for the lake house as at least $10,000. We do not believe that debris removal alone accounted for these estimates. A much more plausible inference is that the cost of the labor and equipment for the demolition constituted a significant portion of the estimate. On this record, we are persuaded that petitioners saved at least $10,000 in the cost of demolition services as a result of their arrangements with the VFD for the donation of the lake house for burning. They accordingly received a benefit with a fair market value in that amount in exchange for the donation.

b. *Value of the Property Donated*

Because petitioners received a substantial benefit in exchange for their donation of the lake house, their entitlement to any charitable contribution deduction under the *Am. Bar Endowment* test depends upon whether the value of the lake house as donated exceeded the value of the demolition services. As noted, the lake house's value for this purpose is its fair market value at the time of the donation, as measured by the willing buyer/willing seller standard in section 1.170A–1(c)(2), Income Tax Regs. Of particular importance here, the fair market value of contributed property must take into account any restrictions or conditions limiting the property's marketability on the date of the contribution. See *Cooley v. Commissioner*, 33 T.C. at 225 (rejecting retail market value as fair market value of automobiles that could not be sold at retail); *Deukmejian v. Commissioner*, T.C. Memo. 1981–24 (rejecting real property valuation premised on property's development value when property's use restricted to open space); *Dresser v. Commissioner*, T.C. Memo. 1956–54 (rejecting real property valuation premised on commercial use when property's use restricted to residential). The restrictions or conditions that must be taken into account include those imposed by the donor incident to the contribution of the property. See *Deukmejian v. Commissioner*, *supra*.

Petitioners contend, and we agree, that their donation of the lake house to the VFD, without their conveyance of the underlying land on which it was sited, effected a "construc-

tive severance" of the structure from the land, recognized under Wisconsin law, even though the structure remained affixed to the land. See *Fitzgerald v. Anderson*, 51 N.W. 554 (Wis. 1892); *Smith v. Waggoner*, 6 N.W. 568 (Wis. 1880); 2 Tiffany Real Property, secs. 623–624 (3d ed. 1939).[14] By transferring the lake house to the VFD without the underlying land, however, petitioners created a substantial restriction or condition on the property's marketability; namely, the lake house could not remain indefinitely on the land upon which it was sited.

Petitioners attached two additional restrictions or conditions on the lake house incident to its donation; namely, the permissible use of the lake house was restricted to firefighter and police training exercises and there was a condition that the lake house be burned down relatively soon after the conveyance. Petitioner's letter memorializing the transfer, though informal, stated that the lake house was to be used by the VFD "for training and eventually demolition", and VFD Chief Wieczorek testified that he understood he could not use the lake house for any other purpose and that the burndown was to take place during the first part of 1998.[15] Thus, in addition to being severed from its underlying land, the lake house as donated could not be used for residential purposes and was subject to a condition that it be promptly burned down.

Petitioners offered the appraisal of their expert, Mr. Larkin, in support of their claim that the lake house had a fair market value of at least $76,000 when donated. In his appraisal Mr. Larkin opined that the lake house had a "contributory value" of $76,000 on the basis of a "before and

[14] Respondent disputes whether the letters between petitioner and the VFD memorializing the donation of the lake house were sufficient to effect a constructive severance of the building from the underlying land. To effect a constructive severance of a building from land, the transfer ordinarily must be in a writing in a form sufficient for a conveyance of land. 2 Tiffany Real Property, sec. 624 (3d ed. 1939). Respondent contends that the letters between petitioner and the VFD were insufficient under the Wisconsin statute of frauds, Wis. Stat. Ann. sec. 706.02 (West 2001), to convey such an interest. We disagree. Under Wis. Stat. Ann. sec. 706.04, a conveyance that does not satisfy every requirement of the statute of frauds may nonetheless be enforced where there has been detrimental reliance. See also *Clay v. Bradley*, 246 N.W.2d 142 (Wis. 1976). The VFD demolished the lake house in reliance on petitioner's Feb. 10, 1998, letter conveying the lake house to the VFD for that purpose.

[15] The letter donating the lake house was dated Feb. 10, 1998, and the burndown by the VFD occurred 11 days later, corroborating Chief Wieczorek's testimony concerning the expectation of the parties to the transfer. The contract for the construction of a new house on the site was signed approximately 5 weeks later. Petitioners' contentions to the effect that there was no agreement or understanding that the house would be promptly burned down are unpersuasive.

after" approach to value, which treated the value of the donated lake house as equal to the difference between the fair market value of the lake property *with* the lake house and the fair market value of the lake property *without* the lake house.

We find the Larkin appraisal to be unpersuasive evidence that the lake house had a fair market value of $76,000 as donated. While the "before and after" method used by Mr. Larkin has been accepted as an appropriate measure of the fair market value of donations of restrictive covenants on real property such as conservation easements, see, e.g., *Symington v. Commissioner*, 87 T.C. 892, 895 (1986); *Schwab v. Commissioner*, T.C. Memo. 1994–232; sec. 1.170A–14(h)(3), Income Tax Regs., petitioners cite no authority for the use of a "before and after" method in valuing a structure that has been severed from its underlying land and encumbered with additional restrictions on use. The "before and after" method as used in valuing easements treats the diminution in the value of the real property that arises from the easement as the measure of the easement's fair market value. See *Symington v. Commissioner*, *supra* at 895. However, we are not persuaded that any diminution in the value of the lake property resulting from the removal of the lake house represents an accurate measure of the value of the lake house as donated to the VFD. Petitioners did not donate an easement—i.e., an intangible property right permanently encumbering the lake property; they donated a structure, severed from the lake property, with substantial restrictions and conditions on its use. [16] As described more fully below, the "before and after" method employed by Mr. Larkin takes no account of these conditions and restrictions that would affect the marketability of the severed structure. See *Cooley v. Commissioner*, 33 T.C. 223 (1959); *Deukmejian v. Commissioner*, T.C. Memo. 1981–24; *Dresser v. Commissioner*, T.C. Memo. 1956–54.

The Larkin appraisal states that "The interest valued is fee simple and unencumbered." Mr. Larkin contends that the value of the lake property for the "donation purposes" to

---

[16] It would appear that petitioners also donated a temporary easement to the VFD granting a right of access to the lake property to conduct the training exercises and controlled burn. However, neither petitioners nor their expert addressed this element of the donation or suggested it had any value.

which it was put was its "contributory value" of $76,000. Mr. Larkin reaches a "contributory value" of the lake house by starting with the fair market value of the lake property as a whole (land, the lake house, and all other improvements), estimated on the basis of sales of comparable residential properties (i.e., $675,000), and subtracting the fair market value of the land (also estimated on the basis of sales of comparable vacant sites) plus the depreciated cost of the improvements other than the lake house (i.e., $599,000). However, since the starting point of Mr. Larkin's calculation was the market value of the lake property as a whole, as measured by sales of comparable properties *where the houses could remain on their sites indefinitely and were available for residential use*, the "contributory value" for the lake house he derived, by subtracting the value of the land and other improvements, necessarily valued the lake house on the basis of its being available for residential use and affixed to the site indefinitely. Thus, the $76,000 "contributory value" of the lake house postulated by Mr. Larkin at best reflects the value of the lake house *before* taking into account its severance from the underlying land, the prohibition on residential use, and the condition that it be burned down promptly. Consequently, the property interest Mr. Larkin appraised is not comparable to the property interest that petitioners donated to the VFD.

Petitioners alternatively contend that the fair market value of the lake house as contributed to the VFD was $235,350, its reproduction cost as estimated by Mr. Larkin. Petitioners offer no expert testimony in support of this proposition. Mr. Larkin did not so opine; petitioners merely borrow his estimate of reproduction cost and assert on brief, relying on *Estate of Palmer v. Commissioner*, 839 F.2d 420 (8th Cir. 1988), revg. 86 T.C. 66 (1986), and *First Wis. Bankshares Corp. v. United States*, 369 F. Supp. 1034 (E.D. Wis. 1973), that because the lake house was "unique" and was "special use" property in the hands of the donee, reproduction cost is the appropriate measure of its value.[17]

---

[17] In their amended petition, petitioners characterize their position as a claim that they are entitled to a deduction equal to the "reproduction" cost of the lake house. On brief, petitioners instead refer to "replacement" cost as the appropriate measure. Petitioners apparently treat "reproduction" and "replacement" cost as synonymous terms. In the circumstances, we find it unnecessary to consider any differences in the two concepts.

Petitioners' reliance on *Estate of Palmer* and *First Wis. Bankshares Corp.* is misplaced. There was nothing unique about the lake house comparable to the unique status of the properties at issue in those cases—in *Estate of Palmer*, a building integral to a college campus and its activities; and in *First Wis. Bankshares Corp.*, a bank structure suitable only to some public use. According to the expert testimony in the record, the lake house was a typical, albeit modest, residence for its area; by their own admission, petitioners contemplated residing in it after remodeling. In addition, the structures at issue in both cases petitioners cite were donated without having been constructively severed from the land on which they were sited. Consequently, the circumstances of this case lend no support to the use of reproduction cost, an approach that also fails to account for the conditions petitioners placed on the lake house incident to the donation.

Instead, the circumstances of this case bring it squarely within the *Cooley* line of cases which require that restrictions or conditions affecting the marketability of donated property be taken into account in determining the value of the donated property. See *Cooley v. Commissioner*, *supra*; *Deukmejian v. Commissioner*, *supra*; *Dresser v. Commissioner*, *supra*; see also Rev. Rul. 85–99, *supra*. "[P]roperty otherwise intrinsically more valuable which is encumbered by some restriction or condition limiting its marketability must be valued in light of such limitation." *Cooley v. Commissioner*, *supra* at 225.

We consider first the impact of the severance of the lake house structure from the underlying land. The price at which the lake house would change hands would undoubtedly be affected by the condition that the structure could not remain affixed to its underlying land indefinitely. Petitioners offered no evidence concerning the impact of this condition. Respondent offered the testimony of two experts in the field of house moving regarding the price at which the lake house would likely sell if required to be moved from its existing site. Both house moving experts concluded that the likelihood of a buyer's purchasing the lake house to move it from the site was virtually nil, because the characteristics of the lake house and its site rendered a relocation of the structure infeasible. We are persuaded that the expert testimony con-

cerning the market for the lake house as a structure to be moved provides a reasonable basis for estimating the impact on fair market value of the severance of the lake house from its underlying land. We find that the severance rendered the lake house virtually worthless.

As for the impact on the lake house's fair market value of the remaining conditions petitioners imposed incident to the donation (the restriction of use to firefighter and police training exercises and the condition that the structure be promptly burned down), there is insufficient evidence in the record to support anything beyond speculation. We are persuaded, however, that the impact on fair market value of the foregoing encumbrances would be adverse rather than beneficial. Finally, as for the possibility that the lake house as encumbered by petitioners' restrictions had a fair market value equal to its salvage value, respondent's expert Mr. George provided expert testimony to the effect that the lake house's salvage value was zero. On the basis of his examination of photographs and a video of the lake house, and a description of its features, Mr. George opined that the value of any salvageable materials would be offset by the costs of removing them. [18] As a consequence, we are persuaded by the evidence that the lake house had no salvage value.

4. *Conclusion*

On the basis of the entire record, we conclude that respondent prevails on his quid pro quo argument. We are persuaded by the evidence that petitioners anticipated a substantial benefit in exchange for their donation of the lake house, in the form of demolition services worth approximately $10,000, and that the fair market value of the lake house as donated did not exceed that figure. Petitioners have failed to prove the lake house had a fair market value exceeding $10,000, because the expert testimony they offered to prove value failed to account for substantial conditions and restrictions imposed on the property incident to its donation, including in particular its severance from the under-

---

[18] Respondent's other expert, Ms. Solko, speculated on the lake house's salvage value on the assumption that certain features might exist. By contrast, Mr. George examined Mr. Larkin's appraisal of the lake house, which included photographs and a description of its features, and the VFD's videotape of its training exercises, which depicts the lake house in greater detail than the photographs in the Larkin appraisal.

lying land. The remaining evidence supports a conclusion that the fair market value of the lake house as encumbered at the time of the donation was de minimis. The lake house could not remain on the land on which it was sited, could not be used for residential purposes, yet had no value as a structure to be moved or any salvage value. We therefore hold that petitioners are not entitled to any charitable contribution deduction for the donation of the lake house because they have not satisfied the *Am. Bar Endowment* test: they have not shown that the market value of the property they donated exceeded the market value of the benefit they received in exchange.[19]

## B. *Accuracy-Related Penalty*

Respondent determined that petitioners are liable for an accuracy-related penalty under section 6662(a) and amended his answer to assert petitioners' liability for a penalty under section 6662(h) for a gross valuation misstatement. Respondent argues on brief in support of the section 6662(a) penalty that petitioners have an underpayment that is attributable to negligence or disregard of rules or regulations under section 6662(b)(1), to a substantial understatement of income tax under section 6662(b)(2), and/or to a substantial valuation misstatement under section 6662(b)(3) that is augmented by section 6662(h) because it is a gross valuation misstatement.

Under section 6664(c), however, generally no penalty is imposed under section 6662 with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. This reasonable cause exception generally does not apply in the case of a substantial or gross valuation overstatement with respect to property for which a charitable contribution deduction was claimed under section 170 unless the claimed value of the property was based on a "qualified appraisal" by a "qualified appraiser" and the tax-

---

[19] Given our conclusion that petitioners' charitable contribution deduction is precluded under *United States v. Am. Bar Endowment*, 477 U.S. 105 (1986), we need not decide respondent's alternate contentions that the deduction is disallowed pursuant to sec. 170(f)(3) or on account of the worthlessness of the lake property at the time of the donation.

payer made a good faith investigation of the value of the contributed property. See sec. 6664(c)(2) and (3). [20]

The determination of whether a taxpayer acted with reasonable cause and in good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664–4(b)(1), Income Tax Regs. Petitioners complied with all reporting requirements, maintained adequate books and records, and fully disclosed the nature of the charitable contribution deduction in dispute on their return. The legal issues raised by their deduction claim were not settled. Importantly, in *Scharf v. Commissioner*, T.C. Memo. 1973–265, this Court held that a charitable contribution deduction was available for the donation of a building (albeit partially destroyed) to a volunteer fire department for demolition in firefighter training exercises. While the validity of the test applied in *Scharf* may have been subject to doubt after the Supreme Court's refinement and clarification of the quid pro quo analysis of charitable contribution deductions in *United States v. Am. Bar Endowment*, 477 U.S. 105 (1986), no Federal court had reconsidered or questioned the *Scharf* holding since the Supreme Court's examination of the issue in 1986. The parties apparently do not dispute that the deduction petitioners claimed on their return was based on a qualified appraisal by a qualified appraiser. While petitioners (like their appraiser) overlooked the impact on the lake house's value of the restrictions attached to the property when it was donated, a reasonable argument could be made that the house had value—which supports a finding that petitioner's investigation of the value of the contributed property was at least in good faith. See sec. 6664(c)(2)(B). On balance, given all the facts and circumstances, including the uncertain state of the law, we find that petitioners acted with reasonable cause and in good faith. Accordingly, they are not liable for any penalty under section 6662.

---

[20] Pars. (2) and (3) of sec. 6664(c) as in effect for 1998 were redesignated pars. (3) and (4), respectively, by the Health Care and Education Reconciliation Act of 2010, Pub. L. 111–152, sec. 1409(c)(1)(A), 124 Stat. 1069.

To reflect the foregoing,

*An appropriate decision will be entered.*